## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FT. MYERS DIVISION

**E. VALERIE SMITH,**

        **Plaintiff,**

**vs.**                              **Case No. 2:14-cv-50-FtM-29MRM**

**FLORIDA GULF COAST UNIVERSITY**
**BOARD OF TRUSTEES,**

        **Defendant.**

_____/

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, FLORIDA GULF COAST UNIVERSITY BOARD OF TRUSTEES ("Defendant" or "FGCU"), pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, moves for summary judgment on all of the remaining claims contained in Plaintiff's Amended Complaint and Demand for Jury Trial (Dkt. No. 8).[1]  The grounds for this Motion are set forth below.

### MEMORANDUM OF LAW

In this action, Plaintiff claims that Defendant discriminated against her on the basis of her race, gender, and national origin and retaliated against her by not renewing her contract. Plaintiff has only brought her claims under Title VII.  There is no evidence to support these claims.  Instead, Plaintiff, an experienced professor, repeatedly failed to meet the minimum

---

[1] Following the Court's Order (Dkt. No. 21), granting, in part, and denying, in part, Defendant's Motion to Dismiss (Dkt. No. 13), Plaintiff's surviving claims are: (1) discrimination based on gender in violation of VII; (2) discrimination based on race in violation of Title VII; (3) discrimination based on national origin in violation of Title VII; and (4) retaliation for complaining of discrimination in violation of Title VII.  Plaintiff's claims are further limited to the nonrenewal decision.  (Dkt. No. 21 at 6-9, 12-13).  The Court concluded that no other actions can be the basis for liability in this case.  (Id.).

expectations of her position, including by repeatedly failing to meet deadlines, complete routine paperwork, provide students with a complete syllabus (which resulted in a grade appeal decided against her), post office hours so students could contact her, respond to students or keep them informed which generated numerous student complaints, administer the state-mandated student assessment of instruction ("SAI") forms correctly, and avoid using her cell phone during class.

FGCU, however, did not immediately terminate Plaintiff.  It first provided her with counseling and opportunities to improve, which included placing her on a performance improvement plan ("PIP") where she had an entire academic year to improve her performance.  Yet, Plaintiff squandered those opportunities.  At the end of the PIP period, Defendant provided Plaintiff an opportunity to demonstrate her compliance with the PIP. Again, Plaintiff failed to do so.  Plaintiff continued in her failure to meet her position's minimum expectations, including failing to provide a complete syllabus to her classes and again incorrectly administering the SAIs.  She also failed to demonstrate that she met the basic teaching, scholarship, and service requirements of her position.  Yet, Defendant did not rush to judgment.  Instead, it asked Plaintiff to provide specific information regarding her performance, including a copy of her sabbatical report.  Plaintiff failed to do so.  Thus, on May 6, 2009, Dean Donna Price Henry notified Plaintiff that her contract would not be renewed after the 2009-2010 academic year ("AY").

After Dean Henry made the decision on May 6, 2009, Plaintiff, as a member of the faculty union, grieved this decision.  Instead of filing a charge of discrimination, Plaintiff intentionally elected to wait in order to pursue the grievance arbitration process.  Thus,

Plaintiff elected not to file a charge of discrimination.  However, after obtaining an unfavorable result in the grievance arbitration process, she filed a charge of discrimination and now argues that her charge was timely, despite her intentional delay in filing it.  Yet, Plaintiff cannot dispute that Dean Henry made a final decision and provided her with notice of that decision on May 6, 2009.  Thus, this entire action should be dismissed as untimely.

Even if Plaintiff could overcome this procedural bar,[2] there is no evidence to support her claims.  She cannot point to another person who engaged in the same misconduct and whose contract was renewed.  In addition to the lack of evidence of disparate treatment and a prima facie case of discrimination, there is also no evidence of pretext.  Plaintiff admits that no one made any disparaging remarks about her race, gender, national origin, or any other protected characteristic.  She further admits that Dean Henry and Dr. Toll believed that she failed to meet the requirements of her position and that this failure warranted nonrenewal of her contract.  Finally, Plaintiff cannot establish a retaliation claim because she did not engage in protected activity, no decision maker had knowledge of any protected activity, and there is no evidence of a causal connection between the nonrenewal decision and protected activity.

I.     **STATEMENT OF UNDISPUTED FACTS**[3]

    A.     **FGCU and the College of Arts and Sciences**

FGCU is a public university located in Fort Myers, Florida, which opened in 1997. (Toll 144:21-22).  It is comprised of several different colleges, including the College of Arts

---

[2] Plaintiff also failed to include her national origin claim in her charge of discrimination and it was not part of the EEOC's investigation.  Thus, this claim also should be dismissed for failure to exhaust administrative remedies.

[3] Defendant's supporting materials are attached, along with an index.  Defendant cites to depositions by using the deponent's last name or "Pl." for Plaintiff along with a pinpoint citation.  The facts recited herein are for purposes of summary judgment only.  Defendant reserves the right to challenge Plaintiff's assertions should this Motion be denied.

and Sciences ("CAS").  (Henry 13:16-14:7, 32:17-34:22).  The CAS is, in turn, comprised of several departments, including the Department of Behavioral and Social Sciences ("DBSS"), which housed the sociology, history, and psychology departments during Plaintiff's employment.  (Henry 32:17-33:13, 38:21-39:4).  A dean oversees CAS and is also its chief academic officer.  (Henry 47:4-48:8; Cudjoe 123:25-124:3).  From 2006 to 2013, the dean was Dr. Donna Price Henry.  (Henry 13:9-14:8).  As dean of CAS, Dean Henry was responsible for, inter alia, managing CAS's operations, overseeing CAS's department chairs who reported to her, and evaluating CAS faculty.  (Henry 32:17-43:11, 47:4-48:4).  Dean Henry reported to FGCU's provost, who was Dr. Ronald Toll beginning in June 2008,[4] and the provost reported to the president who was Dr. Wilson Bradshaw beginning in 2007. (Henry 48:5-11; Toll 13:24-16:3; Bradshaw 6:15-8:5).

Dr. Eric Strahorn served as the chair of the DBSS from August 2005 to August 2008, and reported to Dean Henry.  (Strahorn 7:25-8:14, 10:4-11:14, 22:13-17).  As chair, Dr. Strahorn was responsible for supervising and evaluating full-time and part-time departmental faculty, including Plaintiff.  (Strahorn 9:14-22, 17:15-17).  After Dr. Strahorn's term as chair expired, Dr. Joseph Cudjoe became chair of the DBSS in August 2008.  (Henry 33:14-34:1).

**B.      Documents Governing Faculty Evaluations and Employment**

There are three documents that relate to the evaluation and employment of CAS faculty: FGCU's Collective Bargaining Agreement ("CBA"); FGCU's Faculty Performance Evaluation Document ("FPED"); and CAS's Performance and Evaluation Criteria and Process, ("PECAP").  (Belcher 16:5-21; Toll Ex. 12-13, 20).  The CBA sets forth the wages,

---

[4] Dr. Bonnie Yegedis preceded Dr. Toll as FGCU's provost.  (Toll 125:18-126:3).

hours, and terms and conditions of the faculty's employment.  (Belcher 16:5-21; Toll Ex. 13 at Bates 004116).  The FPED is a university-wide document based on the CBA that sets forth the procedures and standards for evaluating faculty.  (Belcher 16:5-21; Toll Ex. 20 at 2).  The PECAP is a CAS-specific document that sets forth the procedures and standards for evaluating CAS faculty members to the extent that the CBA and FPED are silent on the topic.[5]  (Belcher 17:4-22; Toll Ex. 12).  The PECAP cannot contradict, undermine, or render any provision in the CBA and FPED superfluous, invalid, or meaningless.  (Toll 82:1-15). Nor can the PECAP be interpreted in such a manner.  (Id.).

The majority of CAS's faculty are engaged pursuant to a Continuing Multi Year Appointment ("CMYA"), which is a three-year rolling contract.[6]  (Pl. I 8:8-19).  Faculty members with a CMYA are evaluated on an annual basis.  (Henry 45:10-48:4).  The evaluation period is from May 1st to April 30th.  (Toll Ex. 20 at 13-14).  At the beginning of the evaluation period, the faculty member submits a Performance Development Plan ("PDP"), which is the document outlining the faculty member's academic goals and objectives for the new academic year, including anticipated work in three primary areas: teaching, scholarship, and service.[7]  (Rogers 17:12-21; Toll Ex. 20 at 3-5, 13-14).

By March 31st of the academic year, faculty members must submit an Annual Professional Development Report ("APDR") to their department chair, outlining how they have met their PDP's teaching, scholarship, and service objectives.  (Rogers 18:7-20:6; Toll

---

[5] Notably, the CBA, FPED, and PECAP were created independently from each other.  (Toll 82:1-15, 84:1-5, 91:21-22, 157:2-3).  The CAS faculty, not attorneys, largely drafted the PECAP.  (Id.).  To the extent inconsistencies may exist among the documents, the CBA takes precedence over the FPED, while the FPED takes precedence over the PECAP.  (Toll 82:9-15, 95:17-22).

[6] Each year of the CMYA aligns with the academic year, which is nine months long and runs from the first week of August through the first week of May, excluding the summer term.  (Henry 50:22-51:12).

[7] The PDP is finalized with the department chair by September 30th.  (Pl. I 14:22-15:6; Toll Ex. 20 at 2-5).

Ex. 20 at 13).  The APDR includes such information as the faculty member's course syllabi, student evaluations, scholarly works, and community activities.  (Id.).  After reviewing a faculty member's APDR and conferring with the faculty member, the department chair must issue to the faculty member a Performance Review Report ("PRR") by April 30th, which is a written summary of the faculty member's performance during the review period.  (Rogers 20:7-21:1; Toll Ex. 13 at Article 15.1(A), Ex. 20 at 13-14).

If the faculty member receives an overall satisfactory PRR, he or she is in good standing and receives a one-year contract extension, thereby maintaining a full three-year appointment cycle.  (Cudjoe 30:18-21; Toll Ex. 13 at Article 15.1(B)).  If the faculty member receives an overall unsatisfactory PRR, the faculty member is not in good standing, his or her contract is frozen at three years, and he or she is given one year of probation to remedy the deficiencies to return to a CMYA.  (Cudjoe 30:18-31:1; Toll Ex. 13 at Article 15.1(C)).  During the probationary year, the faculty member is required, in consultation with his or her chair, to draft a one-year PIP,[8] which addresses the deficiencies responsible for the overall unsatisfactory rating, sets forth teaching/service/scholarship objectives, and identifies action items for the following academic year.  (Henry 50:8-53:4; Toll Ex. 13 at Article 15.1(C)(1)).  The PIP replaces the PDP and sets forth tasks that the faculty member must meet to satisfy the PIP and on which that faculty member will be evaluated in the following academic year.  (Id.).

---

[8] The CBA refers to this improvement plan as a "performance improvement plan," while the FPED and PECAP refer to the performance improvement plan as a "performance improvement contract" ("PIC").  (Rogers 24:14-19; Toll Ex. 12 at Section 3.2.6.3; Toll Ex. 13 at Article 15.1(C)(1); Toll Ex. 20 at 7).  Thus, the terms PIP and PIC are often used interchangeably.

The PIP is to be finalized by September 30th of the probationary year. (Toll Ex. 20 at 15). Thereafter, the faculty member, by March 15th of the probationary year, must submit to his or her supervisor a report known as an Annual Professional Development and Performance Improvement Contract Report ("APDR-PIC"), along with supporting documentation, demonstrating fulfillment of the PIP. (Toll Ex. 12 at Section 3.3.2; Toll Ex. 20 at 15). By March 31st of the probationary year, the supervisor must submit a report to the CAS's Peer Review Committee ("PRC") indicating his or her recommendation as to whether the faculty member has satisfied the PIP. (Cudjoe 65:8-66:1; Toll 25:25-26:9, Ex. 20 at 15-17). The PRC reviews the department chair's recommendation and, by April 30th, submits a Peer Review Evaluation to the dean including its recommendation as to the faculty member's probation and contract extension. (Cudjoe 66:12-68:7; Toll Ex. 20 at 15-17). Like the chair's report, the PRC's report is only a recommendation to the dean. (Brown 97:21-98:18).

The dean makes the final decision whether the faculty member has satisfied the PIP and whether he or she should return to a CMYA.[9] (Henry 139:18-21; Toll 20:22-21:9). As set forth in the FPED, by May 6th, the unit's chief academic administrator[10] "will make the final decision with respect to the faculty member's evaluation and contract extension based on the recommendations and documentation provided." (Henry 139:18-21; Toll 20:22-21:9, Ex. 20 at 16; Pl.'s Request for Admissions No. 1). Likewise, the PECAP provides that the

_____

[9] If the faculty member satisfies the PIP and receives an overall satisfactory performance evaluation for the academic year, he or she will return to a full three-year CMYA. (Toll Ex. 13 at Article 15.1(C)(2)-15.1(D); Pl.'s Request for Admissions No. 1). If the faculty member does not satisfy the PIP and receives an overall unsatisfactory performance evaluation for the academic year, the faculty member will have one year remaining on his or her contract and the contract will not be renewed. (Id.).

[10] In the case of CAS, the unit's chief academic administrator is the dean of CAS. (Cudjoe 123:15-124:9, 139:12-14). The CBA defines "college/unit" as a college or a comparable administrative unit generally equivalent in size and character to a college. (Toll Ex. 13 at Article 30). The FPED identifies the chief academic administrator as the college's dean. (Cudjoe 123:15-124:9, 139:12-14; Toll Ex. 20 at 15).

dean will communicate "the final decision regarding extension or nonextension of the CMYA" and requires the dean to "provide by May 6th written notice of renewal or nonrenewal of the CMYA to the faculty member."  (Toll Ex. 12 at Sections 3.3.1, 3.3.2; Pl.'s Request for Admissions No. 1).  If the dean decides not to renew the faculty member's contract, or if the dean's decision differs from the chair's and/or the PRC's recommendations, he or she must furnish a written report regarding his or her decision to the provost by June 1st.  (Toll 82:16-83:3, 84:22-24,  Ex. 12 at Sections 3.3.2, 3.3.5; Pl.'s Request for Admissions No. 1).

The faculty member can appeal the dean's decision to the provost.  (Toll 77:18-23, Ex. 12 at Section 3.3.2, Ex. 20 at 15-17).  Upon receipt of either an appeal by the faculty member or a dissenting report or both, the provost has complete authority to review and modify the final decision of the dean.  (Toll 86:8-88:6, Ex. 12 at Section 3.3.5; Pl.'s Request for Admissions No. 1).  Put another way, the provost may, but need not, weigh in on the dean's final decision.  (Id.).

### C.   Plaintiff Was Counseled About Her Performance Deficiencies

Plaintiff joined FGCU in September 1996 as a full professor of sociology and founding faculty member.  (Pl. I 7:25-8:7).  At the time she joined FGCU, Plaintiff was an experienced professor having previously taught at other colleges, including as a tenured professor at Florida Agricultural & Mechanical University.[11]  (Toll 53:6-22, 76:15-22; Henry 80:1-17).  Plaintiff was hired on a CMYA.  (Pl. I 8:8-19).  Based on this experience, she was familiar with the requirements and expectations of a professor.  (Henry 80:1-82:9, 151:1-10).

---

[11] Plaintiff has more than thirty years experience as a professor.  (Toll 53:19-22).

Upon joining, Plaintiff assumed leadership roles and served on academic committees through which she helped develop FGCU's academic programs, policies, and practices, including crafting the social sciences curriculum.  (Id.).

Prior to AY 2005-2006, Plaintiff generally received satisfactory evaluations, although she was counseled for exhibiting some of the same performance deficiencies that led to her nonrenewal.  (Pl. I 9:5-14:3).  For example, in her AY 1997-1998 evaluation, Plaintiff was counseled for failing to adequately communicate with her students.  (Pl. I 9:5-14:3, Ex. 1-2).  Additionally, in nearly every semester from AY 1998-1999 through AY 2004-2005, a portion of Plaintiff's students evaluated Plaintiff as "poor" or "fair" in SAIs.[12]  (Pl. I 20:14-26:23, Ex. 5-10).  Thereafter, Plaintiff continued to receive counseling as a result of student complaints.  In 2002, two students complained to then-ombudsman Dr. Charles McKinney about Plaintiff's inaccurate syllabus and Plaintiff's "disorganization and dishevelment," "disrespect," and "confusion."  (Pl. I 67:6-68:20, Ex. 32).  In August 2005, another student complained that Plaintiff "is not a good professor at all.  She was late to every class and was unorganized in her teaching."  (Pl. I 69:7-70:17, Ex. 35).  Despite these complaints, Dr. Strahorn provided Plaintiff with an overall satisfactory evaluation for AY 2005-2006.[13]  (Pl. I 29:25-31:1, Ex. 12; Strahorn 21:1-10).  Plaintiff, however, did not use these instances to improve her performance.  Instead, her performance continued to decline.

---

[12] Pursuant to state mandate, students are given the opportunity to assess their instructors. (Henry 16:21-20:17, Ex. 1; Cudjoe 15:15-27:9).  SAIs are issued for each course.  (Pl. I 28:14-29:6).  FGCU's SAI Guidelines require, inter alia, that faculty not issue SAIs in the faculty member's presence or on the same day as an exam. (Henry 16:21-20:17, Ex 1).

[13] During her deposition, Plaintiff testified that she did not know whether Dr. Strahorn was discriminating against her. (Pl. II 108:12-14).  Furthermore, Plaintiff told Dr. Strahorn in an email on September 19, 2007, that she "didn't feel [he was] singling [her] out."  (Pl. I 80:9-19, Ex. 42).

### D.      Plaintiff's Failure to Complete Routine Paperwork in AY 2006-2007

During the Fall 2006 semester, Plaintiff turned in her PDP nearly two months late despite numerous requests from Dr. Strahorn.  (Pl. I 31:2-33:9, Ex. 13-15).  Likewise, at the end of the year, Plaintiff failed to submit her annual report despite Dr. Strahorn's repeated requests.  (Pl. I 35:11-47:3, 84:22-85:11, Ex. 17-25, 27-28).  Without an annual report from Plaintiff documenting her performance, Dr. Strahorn had to evaluate Plaintiff on the information he received, which was nothing.  (Pl. I 35:11-47:3, 84:22-85:11, Ex. 17-25, 27-28).[14]  Thus, he provided Plaintiff with an unsatisfactory annual evaluation.[15]  (Id.).  As a result of the unsatisfactory annual evaluation, Dr. Strahorn, with Dean Henry's oversight, drafted a PIP for Plaintiff.  (Pl. I 79:5-17; Strahorn 22:6-17, Ex. 2).

Eventually, on June 23, 2007, Plaintiff submitted an annual report to Dr. Strahorn.  (Pl. I 43:23-44:15, 52:13-24, Ex. 26, 30).  Ultimately, then-Provost Yegedis and Dean Henry decided that Plaintiff should be re-evaluated based on this annual report.  (Pl. I 82:13-89:25, Ex. 43; Henry 85:10-86:3).  Dr. Strahorn re-evaluated Plaintiff and gave her an overall satisfactory rating, although he counseled her regarding her mediocre student scores and noted several areas of improvement.  (Pl. I 90:1-94:12, Ex. 45).  In light of the revised annual evaluation, Plaintiff was no longer subject to a PIP for AY 2007-2008, but rather a PDP.  (Pl.

---

[14] Dr. Strahorn also noted in the PRR that, during AY 2006-2007, Plaintiff failed to meet routine deadlines and was difficult to reach.  (Pl. I Ex. 27).  Plaintiff was not the only faculty member who failed to complete an annual report for AY 2006-2007 and received an unsatisfactory evaluation.  (Henry 68:14-76:13; Strahorn 62:2-65:14, Ex. 16, 17).  A U.S. born Caucasian female assistant professor, Dr. Stacy Anderson, who was a member of the psychology department, also received an overall unsatisfactory rating when she failed to submit an annual report for AY 2006-2007.  (Id.).  Dr. Anderson, like Plaintiff, was evaluated again once she submitted her annual report and was given a satisfactory evaluation.  (Id.).  There is no evidence that Dr. Anderson had the same performance problems as Plaintiff in AY 2007-2008, including numerous student complaints or a successful grade appeal based on an inadequate syllabus.

[15] That plan required Plaintiff to set and keep regular office hours, post office hours, reply to email and voicemail within 72 hours, submit a plan for sabbatical, and, at the end of the sabbatical, submit a sabbatical report.  (Id.).

I 94:15-95:2).  As Plaintiff did not prepare a PDP, the PIP that Dr. Strahorn drafted for AY 2007-2008 served as Plaintiff's PDP.  (Pl. I 94:15-97:13, Ex. 46, 49).

Notwithstanding her performance problems, during the Spring 2007 semester, Defendant approved Plaintiff for a sabbatical during the Spring 2008 semester.  (Pl. I 97:22-106:12, Ex. 50-52).  Notably, in a letter that then-Provost Yegidis sent to Plaintiff notifying her of the sabbatical approval, Provost Yegidis informed Plaintiff that, "within thirty days of returning from sabbatical, you must provide the Provost a concise written report of your accomplishments during the sabbatical."[16]   (Pl. I Ex. 52).

### E. Plaintiff's Performance Further Declines in AY 2007-2008 With Increased Student Complaints, a Successful Grade Appeal, Solicitation of a Student for a Positive Review, Improperly Administered SAIs, Refusal to Cooperate, and Continued Missed Deadlines

Despite repeated counseling regarding her failure to meet deadlines, Plaintiff continued submitting documents late during AY 2007-2008.[17]   (Pl. I 95:4-17, Ex. 47). Additionally, Plaintiff's students continued to complain about Plaintiff.  (Strahorn 28:10-29:4, 81:6-17; Pl. I 70:18-74:18, 106:13-106:19, Ex. 36-39).  For example, from August to October 2007, at least four students complained to Dr. Strahorn that Plaintiff had not calculated grades properly (Pl. I 71:2-24, Ex. 36, 53), had not initiated one of her courses on time (Pl. I 71:25-72:13, Ex. 37), failed to respond to students in a timely fashion (Pl. I 73:4-75:3, Ex. 38), and was difficult to reach (Pl. I 106:13-124:3, Ex. 53).[18]

---

[16] FGCU maintains Sabbatical Guidelines which incorporate, inter alia, a form cover sheet for the submission of sabbatical reports stating that faculty members should submit their original sabbatical report to FGCU's provost and send a copy to their supervisor.  (Henry 20:24-21:17, Ex. 2 at Bates 004289).

[17] Plaintiff's subsequent supervisor, Dr. Cudjoe, recalled that other DBSS faculty members almost always submitted materials on time.  (Cudjoe 117:21-118:1).

[18] In an effort to address these student complaints and confirm their validity, in October 2007, Dr. Strahorn notified Plaintiff that he would be visiting her online course, which was generating many student complaints.

Later, in November 2007, eight students complained to the CAS Associate Dean that Plaintiff answered her cell phone in class,[19] was sleeping during class, and took a month to grade and return an exam.  (Pl. I 141:9-142:13, 162:11-12, Ex. 63).  Plaintiff's students also complained that Plaintiff deviated from the syllabus, including moving and/or not administering exams as scheduled.  (Pl. I 143:21-149:21, Ex. 63; Pl. II 73:8-19, Ex. 128).  In December 2007, Plaintiff's students complained, inter alia, that Plaintiff's syllabus contained numerous errors, that Plaintiff was continuously late for class, and that she improperly administered SAIs by remaining in the doorway and watching the students complete them. (Pl. I 151:3-19, 153:9-23, Ex. 63).  One of Plaintiff's students also filed a grade appeal based on Plaintiff's inadequate syllabus, which was successful.[20]   (Pl. I 154:8-155:13, 195:13-204:1, Ex. 64, 80-88).  Near the end of the Fall 2007 semester, Plaintiff asked one of her students to send a positive review to Dean Henry.  (Pl. II 68:18-70:25, Ex. 127).  After the student agreed to do so, Plaintiff informed him that she looked at his work again and decided that he deserved a higher grade.  (Id.).

---

(Strahorn 31:4-33:12).  The CBA specifically allowed Dr. Strahorn to conduct this visit.  (Strahorn 31:4-9; Toll Ex. 13 at Article 10.2.(B)).  Plaintiff attempted to deny Dr. Strahorn access by contacting Jennifer Sparrow, an FGCU information technology employee.  (Pl. I 75:17-20, 123:14-141:8, Ex. 54-62; Strahorn 30:22-32:24). Ultimately, Dean Henry became involved and informed Plaintiff that Dr. Strahorn was permitted to visit and observe her class for evaluative purposes, noting that such observance was appropriate given the number of student complaints generated from the class.  (Pl. I 135:23-136:16).  While Plaintiff objected to the level of access Dr. Strahorn received (he was enrolled as a class instructor as opposed to a guest), the limited access Plaintiff suggested would not have allowed Dr. Strahorn to observe class communications between Plaintiff and her students, which was a source of many of the complaints.  (Pl. I 136:20-137:12, 138:21-139:2).  During her deposition, Plaintiff admitted that Dr. Strahorn had a legitimate reason to know what was happening in her class given the student complaints.  (Pl. I 132:15-24).  In addition, Dr. Strahorn only accessed the online class on two occasions. (Pl. II 65:17-66:13, Ex. 126).  Moreover, this is no evidence that Dr. Strahorn treated any other faculty member differently with respect to his classroom observations.
[19] Plaintiff admits to talking on her cell phone during class.  (Pl. I 142:3-13, 153:17-23).
[20] During her deposition, Plaintiff could not identify any other faculty member with the same scope and volume of student complaints that she received.  (Pl. I 65:24-66:6).

In the Spring 2008 semester, Plaintiff submitted her annual report to Dr. Strahorn, although she did so a day late and the report contained numerous typographical errors.[21]  (Pl. I 169:20-171:8, 176:21-177:10 Ex. 65-66).  She thereafter revised the annual report.  (Pl. I 172:14-175:19, Ex. 67).  Based on Plaintiff's performance in AY 2007-2008, including the numerous student complaints and successful grade appeal, Dr. Strahorn issued Plaintiff an overall unsatisfactory annual evaluation on April 30, 2008.  (Pl. I 177:20-179:5, Ex. 70; Henry 86:4-21, Ex. 8).  In the annual evaluation, Dr. Strahorn noted, inter alia, that Plaintiff continued having problems meeting deadlines, received many student complaints, improperly issued SAIs, received low-rated SAIs, and attempted to deny him access to her online class. (Pl. I 177:20-181:16, Ex. 70).  Dr. Strahorn also identified performance tasks for Plaintiff to meet and noted inaccuracies in her annual report.  (Id.).

Shortly after receiving the annual evaluation, Plaintiff met with Dr. Strahorn and sent him additional documentation in an attempt to persuade him to revise it.  (Pl. I 181:17-184:10, Ex. 72).  Dr. Strahorn made some revisions to the annual evaluation, however, substantively, it remained nearly the same.[22]  (Pl. I 186:20-187:8, 193:24-195:12, Ex. 75, 79).  In light of the annual evaluation, Dr. Strahorn informed Plaintiff that she would need to submit a draft PIP for AY 2008-2009.  (Id.).  Plaintiff refused to sign the unsatisfactory annual evaluation and refused to submit a draft PIP.  (Pl. I 188:19-189:16, Ex. 76).  Instead, Plaintiff appealed her AY 2007-2008 annual evaluation through internal complaints to Dean

---

[21] Among Plaintiff's annual report was an entry that Plaintiff planned to present and publish a paper using the research she collected during her sabbatical.  (Pl. I Ex. 66).  Upon receiving the annual report, Dr. Strahorn notified Plaintiff that the paper would be reviewed during the following academic year.  (Pl. I. 171:9-172:6, Ex. 66).  Plaintiff never did present or publish that paper.  (Pl. I 97:25-99:17).

[22] Dr. Rogers also suggested revisions to the evaluation, but none of them were substantive.  (Strahorn 43:1-46:1, 80:2-13, Ex. 6-7).  Instead, Dr. Rogers was focused on conforming the language with the CBA.  (Id.; Rogers 68:12-72:3).

Henry, Dr. Toll, and President Bradshaw.  (Pl. I 204:6-15, 206:24-210:19, 211:3-220:22, 227:14-22, Ex. 90-92, 97).[23]

Because Plaintiff refused to prepare the PIP, Dr. Strahorn prepared it with Dean Henry's oversight shortly before he left his position as chair.  (Pl. I 188:19-191:2, Ex. 77; Henry 86:22-95:11).   The PIP set forth Plaintiff's objectives for teaching, service, and scholarship for AY 2008-2009 and incorporated nine "[o]ther duties" assigned to Plaintiff, including,

- "Follow the correct procedure when conducting the Student Assessment of Instruction for each of [Plaintiff's] courses";

- "Submit all paperwork on time"; and

- "On the first day of class, [Plaintiff] should provide all students with a complete syllabus for the course.  This includes information on attendance policy, make up exam/late paper policy, plagiarism and cheating policy and course schedule.  Any changes to the course syllabus must be provided to students in writing;"[24]

(Pl. I Ex. 77).  The PIP warned Plaintiff that her contract may not be renewed if she failed to satisfy these requirements.  (Id.).

---

[23] In her letter to President Bradshaw, Plaintiff complained about a number of different topics, including her relocation from Reed Hall to the modular building, which housed the other DBSS faculty, including Drs. Strahorn and Cudjoe. (Pl. I 221:24-223:7, Ex. 92; Strahorn 49:2-51:24).  President Bradshaw met with Plaintiff to discuss her appeal. (Bradshaw 8:10-12:24).  While in her deposition Plaintiff initially claimed that she also complained of discrimination in this meeting with President Bradshaw, that assertion is absent from her contemporaneous letter that she sent to President Bradshaw after she met with him.  (Pl. I 219:5-220:22, Ex. 92).  Plaintiff also later confirmed that she only complained to Dr. McKinney about discrimination.  (Pl. II 106:5-107:2).  In addition, there is no evidence that either Dean Henry or Dr. Toll had any knowledge that Plaintiff complained about discrimination before Dean Henry made her decision on May 6, 2009, not to renew Plaintiff's contract.  (Henry 222:23-223:9, 229:12-18; Toll 124:14-19, 130:2-15).  In fact, it was not until May 30, 2009, after Dean Henry's decision, that Plaintiff sent an email to Dr. McKinney complaining of age discrimination, "subtle racism," and periodic harassment "based perhaps on gender and perhaps based on . . . race."  (Pl. II 11:7-14, 12:6-9, Ex. 114 at Bates 004197; Strahorn Ex. 13).

[24] The PIP's syllabus requirements memorialized the syllabus expectations already in effect prior to FGCU adopting written syllabus guidelines.  (Duff 49:1-25, Ex. 1).  Plaintiff does not dispute that the syllabus provisions delineated in her PIP needed to be included in her AY 2008-2009 syllabi.  (Pl. II 44:20-22, 45:16-46:1).

In August 2008, Dr. Cudjoe took over as chair of the DBSS and, among other duties, monitored Plaintiff's compliance with her AY 2008-2009 PIP.  (Henry 94:6-22).  On March 12, 2009, Dr. Cudjoe advised Plaintiff of the PIP review process and requested that she provide him an APDR-PIC as well as supporting documentation evidencing her compliance with the PIP.  (Pl. I 223:18-224:17, Ex 93).  Thereafter, Plaintiff submitted her APDR-PIC and supporting documents to Dr. Cudjoe.  (Cudjoe 37:18-39:13, Ex. 7).  After receiving and reviewing Plaintiff's APDR-PIC, on March 27, 2009, Dr. Cudjoe submitted his recommendation to then-PRC committee chair, Dr. David Brown.[25]  (Pl. I 225:10-226:17, Ex. 94).  In his memorandum, Dr. Cudjoe recommended that Plaintiff's probationary status be removed.[26]  (Id.).  On April 10, 2009, after receiving Dr. Cudjoe's recommendation, Dr. Brown requested that Plaintiff provide additional documents necessary for the PRC to complete its review, including her course syllabi for courses she taught during AY 2008-2009 as well as SAIs for courses she taught during the Fall 2008 semester.[27]  (Pl. I 226:18-227:7, Ex. 95; Henry 105:14-106:11, Ex. 12).  Plaintiff provided the PRC with the requested

[25] Dr. Cudjoe admitted that he could not recall any other faculty members with performance issues similar to Plaintiff.  (Cudjoe 60:3-9).

[26] Notably, Dr. Cudjoe failed to review Plaintiff's teaching, scholarship, and service requirements as set forth in the PIP.  (Henry 102:14-21).  Additionally, after his review, Plaintiff improperly administered the SAIs again.  (Pl. I 229:5-231:18, Ex. 99).  Moreover, Dr. Cudjoe doesn't find that Plaintiff satisfied each of the requirements of the PIP.  (Pl. I. Ex 94).  Instead, he found that she had "shown improvement," which was the basis for his recommendation.  (Id.).

[27] Plaintiff was required to demonstrate her satisfaction of the PIP requirements.  (Henry 194:3-5; Toll 68:11-18, 72:3-23, Ex. 12 at Section 3.3.2, Ex. 20 at 15-16).  Yet, she did not provide her syllabi, which were part of the PIP, to the PRC to demonstrate her compliance until after the PRC made a specific request for them.  (Pl. I 226:18-227:7, Ex. 95).  The governing documents are clear – Plaintiff had an obligation to submit all materials to demonstrate her compliance.  (Henry 194:3-5; Toll 68:11-18, 72:3-23, Ex. 12 at Section 3.3.2, Ex. 20 at 15-16).  Neither the PRC nor Dean Henry has an obligation to request these materials from Plaintiff and they were entitled to make a determination on the materials submitted.  (Id.).  Nevertheless, both the PRC and Dean Henry explained the deficiencies in Plaintiff's materials and gave her an opportunity to supplement her submission.  (Pl. I 226:18-227:7, 231:19-232:22, Ex. 95, 101; Henry 115:24-122:8).  While Plaintiff provided some materials to the PRC, she refused to provide any additional materials to Dean Henry even though Dean Henry explained the deficiency in Plaintiff's submissions.  (Pl. I 232:23-235:19, Ex. 102; Henry 125:23-127:6).  Thus, Dean Henry had no choice but to evaluate Plaintiff on the materials provided.  (Id.).

materials on April 17, 2009.  (Pl. I 227:8-11, Ex. 96; Henry 107:1-21, Ex. 13).  On April 21, 2009, the PRC concurred with Dr. Cudjoe and recommended to Dean Henry that Plaintiff be restored to a CMYA appointment.  (Pl. I 227:25-228:4, 228:21-229:4, Ex. 98).

> **F.   After the Chair and PRC Made Their Recommendations, Plaintiff Continued to Violate the PIP's Requirements**

Before Dean Henry independently reviewed Plaintiff's compliance with the PIP, Plaintiff improperly administered the SAIs again.  (Pl. I 229:5-231:18, Ex. 99).  In particular, contrary to Defendant's SAI guidelines, Plaintiff administered the SAIs on the day of a final examination.[28]  (Id.).  Following this incident, Dean Henry notified Plaintiff that she had received Dr. Cudjoe's and the PRC's recommendations, but believed that Plaintiff had not submitted sufficient documentation to demonstrate her achievement in teaching, scholarship, and service.  (Pl. I 231:19-232:22, Ex. 101; Henry 115:24-122:8).  Dean Henry requested that Plaintiff submit additional supporting materials, including evidence reflecting Plaintiff's teaching, scholarship, and service activities as well as a copy of Plaintiff's sabbatical report.  (Id.).  Plaintiff refused to provide her sabbatical report to Dean Henry[29] and, instead of

---

[28] Plaintiff was aware of Defendant's SAI guidelines, including the prohibition on administering SAIs on the same day as a scheduled exam.  (Pl. I 230:3-25, Ex. 100).

[29] Plaintiff contends that Dean Henry improperly considered her sabbatical report as part of this evaluation for AY 2008-2009 because it was due in the previous academic year.  (Pl. I 103:1-7).  Plaintiff also contends that she submitted her sabbatical report to President Bradshaw on May 12, 2008.  (Pl. II 53:11-55:23).  Even if true, this shows that it was properly considered by Dean Henry since the review period for the AY 2008-2009 evaluation is May 1, 2008, to April 30, 2009.  (Toll Ex. 20 at 13-14).  Furthermore, the PECAP provides that documents submitted after April 30th shall be considered evaluative information for the next following year.  (Cudjoe 126:20-127:7, Ex. 2; Toll Ex. 12 at Section 3.2.3.1).  Regardless, there is no justification for Plaintiff's refusal to abide by Dean Henry's direction to provide the sabbatical report.  There also is no evidence that Dean Henry evaluated any other faculty members' sabbatical differently than Plaintiff.  In other words, even if Dean Henry incorrectly interpreted the sabbatical guidelines, there is no evidence of any disparate treatment or application of these guidelines.  Additionally, it cannot be disputed that the sabbatical report would be evidence of Plaintiff's scholarship.  (Cudjoe 10:20-25).

submitting additional supporting documentation, sent Dean Henry the same documentation she provided to the PRC.  (Pl. I 232:23-235:19; Henry 125:23-127:6, Ex. 16).

### G.    Dean Henry Decides Not To Renew Plaintiff's CMYA

On May 6, 2009, Dean Henry sent Plaintiff a memorandum stating that her performance during AY 2008-2009 was unsatisfactory and that Defendant would not renew her CMYA.  (Pl. I 235:20-236:4, Ex. 103; Henry 139:18-140:1).  In particular, Dean Henry explained: "I am giving you notice that your current contract will not be renewed beyond the May 6, 2010 date.  No further notice of cessation of employment is required."  (Id.).  Dean Henry's May 6, 2009, letter served as the final notice to Plaintiff that her CMYA would not be renewed.[30]  (Henry 139:18-140:1; Toll 20:22-21:9, 82:16-83:8, 84:20-24).

On May 19, 2009, Dean Henry sent Plaintiff a memorandum outlining the basis for her May 6, 2009, decision.[31]  (Pl. I 242:23-244:1, Ex. 107; Henry 142:15-143:7, Ex. 18).  In her memorandum, Dean Henry explained that Plaintiff failed to demonstrate that she satisfied the teaching, scholarship, and service objectives; the requirement to administer SAIs correctly;[32] the obligation to submit all paperwork timely (including her sabbatical report);[33]

---

[30] Plaintiff fully understood the finality of Dean Henry's decision.  Indeed, on May 29, 2009, Plaintiff admitted to Julia Corbett, a counselor available to FGCU employees, that she was upset about her recent termination. (Corbett 7:21-14:13, 17:16-18:23, 20:12-19, Ex. 1).

[31] Before receiving Dean Henry's explanation, on May 12, 2009, Plaintiff formally requested that the union file a grievance against Dean Henry based on her May 6, 2009, decision, noting in her request that Dean Henry "gave [her] a termination letter."  (Pl. I. 239:4-25, Ex. 105).

[32] Plaintiff does not dispute that she failed to comply with the PIP's SAI requirements.  (Pl. I 243:4-19; Pl. II 21:9-12, Ex. 115 at Bates 004201).

[33] Plaintiff does not dispute that she failed to submit the sabbatical report to the provost as directed in the letter approving the sabbatical or that she refused to provide the report to Dean Henry when she requested it. (Pl. I 232:23-235:19; Pl. II 58:4-14).

and the syllabi requirements.[34]   (Pl. I 259:20-24, Ex. 107; Henry 143:8-153:13, 156:22-157:16, 167:18-172:11, 182:8-192:19, Ex 18).   That same day, pursuant Article 20 of the CBA, Plaintiff sent Dr. Toll an email requesting Informal Resolution of Dean Henry's decision.  (Pl. I Ex. 109 at Bates 002679; Pl. II 7:19-8:3).   On May 22, 2009, Dean Henry submitted a report and related documents to Dr. Toll informing him of her final decision on the nonrenewal of Plaintiff's CMYA.  (Henry 206:6-211:25, Ex. 23; Toll 89:7-90:2).

Plaintiff did not appeal Dean Henry's final decision to Dr. Toll even though that option was available to her.  (Cudjoe 124:21-126:19; Belcher 23:5-8; Toll 80:9-81:11, Ex. 12 at Section 3.3.1, Ex. 20 at 15-17).   Instead, on July 23, 2009, Plaintiff filed a Step One Grievance pursuant to the CBA challenging Dean Henry's May 6, 2009, nonrenewal decision based, in part, on her position that Dean Henry lacked the authority to issue a final determination on her CMYA.  (Pl. I 245:19-246:6, Ex. 109 at Bates 002707-10).   On August 17, 2009, Plaintiff attended a Step One meeting with her union representatives and FGCU administrators during which FGCU denied the grievance, explaining that Dean Henry had the authority to make a final decision.   (Pl. I 248:4-250:10, Ex. 110; Belcher 49:25-51:10).  However, Plaintiff did have the right to seek review of that decision.  (Belcher 23:5-8; Toll Ex. 12 at Sections 3.3.2, 3.3.5; Toll Ex. 20 at 16).  As part of this grievance process, FGCU confirmed that Plaintiff wanted Dr. Toll to review Dean Henry's decision.  (Pl. I 250:11-24, Ex. 109-110).  As a result, Dr. Toll thereafter reviewed and affirmed Dean Henry's decision.  (Pl. I 250:11-251:7, Ex. 111; Toll 17:2-21:21, 21:6-15, 66:12-72:23, 82:16-83:3, 84:22-24,

---

[34] Plaintiff acknowledged that several of her syllabi omitted the necessary attendance policy, make-up exams/late papers policy, and student observance of religious holidays policy.  (Pl. II 36:15-40:3).  Yet, this requirement was clearly set out in the PIP.  (Pl. I. Ex. 77).

86:8-88:6, Ex. 2).   Despite Plaintiff's knowledge that Dean Henry's decision was final, Plaintiff delayed in filing a charge of discrimination with the EEOC to pursue her grievance rights under the CBA.

### H.      Plaintiff Files a Step Two Grievance and Participates in Arbitration

On October 20, 2009, Plaintiff filed a Step Two grievance, which was denied on November 18, 2009, and Plaintiff requested arbitration on December 2, 2009.  (Pl. I 251:8-20, 252:19-25, 253:4-25, Ex. 106, 113).  The arbitration was held on April 12, 2010.  (Id.). In email messages exchanged with her union representatives, Plaintiff acknowledged that she knew she had 300 days to file an EEOC charge, that the deadline was not tolled to pursue a grievance or arbitration, and that the EEOC advised her to file the charge as soon as possible. (Pl. II 24:4-26:5, Ex. 116).  Plaintiff, however, indicated that she was going to wait to file the charge to avoid disrupting the grievance process.  (Id.).   On April 26, 2010, the arbitrator denied Plaintiff's grievance, finding it was untimely.  (Pl. I 253:4-254:21, Ex. 104).  Plaintiff filed a charge of discrimination with the EEOC on June 30, 2010.  (Composite Ex. A at Bates 500024).  Plaintiff's employment with FGCU ended on September 8, 2010.  (Id.; Strahorn 17:24-25).

A few months later, FGCU took efforts to fill the sociology professor position now vacant as a result of Plaintiff's separation.  (Strahorn 65:24-74:11, Ex. 18-19).  FGCU's search committee interviewed several candidates and narrowed the applicant pool to three individuals:  Dr. Jason Rodriguez, Dr. Krista Bywater, and Dr. Jan-Martin Meij (a foreign born Caucasian male).  (Toll 110:16-111:11; Strahorn 65:24-74:11, Ex. 20-23).   FGCU offered the position to Dr. Bywater; however, Dr. Bywater turned down the offer.  (Strahorn

68:13-74:11, Ex. 22-23).  As a result, FGCU offered the position to Dr. Meij who accepted it. (Id.).

## II.      **LEGAL ARGUMENT**

The material facts in this case are not disputed.  As an initial matter, Plaintiff's claims are untimely.  She failed to file a charge of discrimination within 300 days of Dean Henry's decision.  There is no genuine dispute that Dean Henry had the authority and did render a final decision on May 6, 2009.  All of Defendant's witnesses confirm and agree that Dean Henry had this authority.  Although this decision was subject to review through the grievance process or by Dr. Toll, that review does not render Dean Henry's decision any less final.  The only support Plaintiff has for her position is her improper and self-serving interpretation of the shared governance documents.  However, she has been on notice since August 17, 2009, that this interpretation is incorrect.  She still did not file a charge.  Instead, she intentionally waited until after the conclusion of the grievance and arbitration proceedings.  She cannot now try to revive her claim by this improper interpretation, especially when she knowingly delayed.  Plaintiff also failed to exhaust her administrative remedies with respect to the national origin claim.  She did not include this claim in either her charge or amended charge of discrimination nor did the EEOC investigate it.

Even if Plaintiff could overcome these procedural bars, there is no merit to her underlying claims.  Despite her significant experience as a university professor, Plaintiff failed to meet the basic expectations of her position even after receiving counseling and a PIP as well as having more than a year to perform.  Defendant gave Plaintiff specific, clear objectives and tasks to meet during AY 2008-2009 which Plaintiff admitted she failed to

satisfy.   Ultimately, Plaintiff's own poor performance resulted in the nonrenewal of her CMYA.   There is no evidence of discrimination or retaliation.   She cannot point to any evidence of disparate treatment or identify any comparator who was treated differently.   She also cannot adduce any evidence to establish a prima facie case of discrimination or retaliation or to create a genuine issue of material fact as to pretext.   Consequently, Defendant is entitled to judgment as a matter of law.

### A.    Plaintiff's Claims Are Time Barred

As a threshold matter, Plaintiff's claims are time barred.   In order to state a claim under Title VII in a deferral state such as Florida, Plaintiff is required to file a charge of discrimination within 300 days of the discriminatory act.   See 42 U.S.C. § 2000e-5(e)(1); see also, E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1271 (11th Cir. 2002).   Plaintiff bears the burden of establishing that she timely exhausted her administrative remedies.   See e.g., Antoniewicz v. Univ. of Texas Health & Sci. Ctr. at Houston, No. CIV.A. H-14-2083, 2015 WL 3771007 at *8 (S.D. Tex. June 17, 2015).

The continuing violation doctrine permits a plaintiff to sue on an otherwise time-barred claim where at least one other violation occurred within the statutory period.   Hipp v. Liberty Nat. Life Ins. Co., 252 F.3d 1208, 1221 (11th Cir. 2001).   However, the doctrine does not apply to discrete acts of discrimination, such as the nonrenewal decision.   See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113-114 (2002).   A discrete act "occurs" for statute of limitation purposes on the date that decision was made and communicated.   Everett v. Cobb County School Dist., 138 F.3d 1407, 1410 (citing Del. State College v. Ricks, 449 U.S. 250, 258 (1980)).   In termination cases, the limitations

period commences on the date the employee receives unequivocal notice of termination. See Jordon v. City of Montgomery, 283 F. App'x 766, 767-68 (11th Cir. 2008). An employee's pursuit of an internal appeal, "or some other method of collateral review of an employment decision, does not toll the running of the limitations period[ ]." Id.

Here, pursuant to the FPED, Dean Henry issued her May 6, 2009, memorandum, which was a final decision on Plaintiff's CMYA. (Toll Ex. 20 at 16; Toll Ex. 12 at Sections 3.3.1, 3.3.2).[35] Indeed, both the FPED and PECAP expressly state that the dean makes the final decision on nonrenewal.[36] (Toll Ex. 12 at Sections 3.3.1, 3.3.2; Toll Ex. 20 at 16). Additionally, Dean Henry's May 6, 2009, memorandum was clear and unequivocal when it provided, "I am giving you notice that your current contract will not be renewed beyond the May 6, 2010 date. No further notice of cessation of employment is required." (Pl. I Ex. 103). Notwithstanding the manner in which Plaintiff interprets the FPED or PECAP, Dean Henry, Dr. Toll, and Dr. Rogers, who were tasked with carrying out these documents, testified that Dean Henry's May 6, 2009, memorandum served as a final decision notwithstanding the fact that it was subject to review.[37] (Toll 20:22-21:9, 82:16-83:8, 84:20-24; Henry 139:18-140:1; Rogers 21:9-19, 32:3-11, 35:1-36:8). There is no evidence that Dean Henry, Dr. Toll, or anyone else at FGCU interpreted or carried out these documents differently.

---

[35] As noted above, the FPED provides that "the unit's chief academic administrator [i.e. the CAS Dean] will make the final decision with respect to the faculty member's evaluation and contract extension based on the recommendations and documentation provided." (Toll Ex. 20 at 16). To the extent that Plaintiff interprets the PECAP in a manner inconsistent with this language, as Dr. Toll testified, the FPED takes precedence over the PECAP. (Toll 82:9-15; 95:15-22).

[36] The CBA contains no language addressing who makes the final decision on nonrenewal.

[37] The rendering of a CMYA renewal decision operates similar to the court system. The Dean's renewal decision is final in the same sense as a judgment of a district court is final and stands unless reversed by the appellate court (i.e., Dr. Toll).

Plaintiff's contemporaneous statements and actions further reflect her understanding that Dean Henry's decision was final.  For example:

- On May 12, 2009, Plaintiff formally requested that the union file a grievance against Dean Henry based on her May 6, 2009, decision, noting in her request that Dean Henry "gave [her] a termination letter."  (Pl. I 239:4-25, Ex. 105);

- In a meeting with a counselor on May 29, 2009, Plaintiff complained about emotional distress resulting from her "recent termination" from FGCU (Corbett 7:21-14:13, 17:16-18:23, 20:12-19, Ex. 1 at 4-6);

- In a May 30, 2009 email to Dr. McKinney, Plaintiff referenced Dean Henry's nonrenewal decision as her "termination" (Pl. II 11:7-14, 12:6-9, Ex. 114 at Bates 004197);

- On July 13, 2009, Plaintiff wrote an email to her union representative, Dr. McGaha, asking whether she should "limit" an internal complaint "to the termination." (Pl. II 19:5-13, Ex. 114 at Bates 004195);

- On October 2, 2009, Plaintiff noted, "[Dean Henry's] decision was final on May 6th, 2009, as evidenced by her statement that I am terminated effective May 5, 2010." (Pl. I Ex. 106 at Bates 002495).

While Plaintiff may now contend that only Dr. Toll makes a final decision on nonrenewal, accepting that position would render meaningless the FPED's (and the PECAP's) explicit language, providing that the dean shall make the final decision on nonrenewal.  (Toll Ex. 12 at Sections 3.3.1, 3.3.2; Toll Ex. 20 at 16).  In addition, the notice provided to Plaintiff was clear and unequivocal.  Plaintiff admitted that she knew the risks of failing to file her charge within the 300-day deadline, but she intentionally delayed doing so to avoid disrupting the arbitration proceedings she had initiated.  (Pl. II 24:4-26:5, Ex. 116).  Plaintiff made that choice despite having been counseled by the EEOC to file her charge as soon as possible.  (Id.).  Ultimately, because Dean Henry's May 6, 2009, memorandum

served as a final decision that Defendant would not renew Plaintiff's CMYA, Plaintiff needed to file her charge of discrimination by March 2, 2010. Plaintiff did not file her charge until June 30, 2010. (Composite Ex. A at Bates 500024).[38] Thus, as Plaintiff failed to timely exhaust her administrative remedies, her claims are time barred.[39]

Defendant's position is not only supported by the undisputed facts and the shared governance documents' plain language, several courts have held that claims are time-barred in similar circumstances. For example, in Del. State College v. Ricks, 449 U.S. 250 (1980), the Supreme Court concluded that a professor's charge was untimely when he failed to file it upon the notice of denial of tenure, even though that decision was subject to review. Del. State College, 449 U.S. at 254-261.[40]

Similarly, the Fifth Circuit recently affirmed the dismissal of a professor's claims as time-barred in Niwayama v. Texas Tech Univ., 590 F. App'x 351, 355 (5th Cir. 2014) cert. denied, 135 S. Ct. 1716, 191 L. Ed. 2d 678 (2015). In that case, a university professor asserted claims for gender discrimination under Title VII arising from her tenure denial. Id. at 353. The district court held that the professor's claims based on her tenure denial were untimely because she failed to file a charge of discrimination with the EEOC within 300 days of when the provost informed her of the tenure denial. Id. at 355. The court rejected the

---

[38] Composite Exhibit A is comprised of portions of the EEOC's investigatory file, which were provided in response to a Freedom of Information Act request.

[39] To the extent Plaintiff argues that she did not know Dean Henry's decision was a final decision on her CMYA based on ambiguous language in the PECAP, she certainly had notice by August 17, 2009, when she attended a Step One grievance meeting. (Pl. I 248:4-250:10, Ex. 109 at Bates 002613-2615, Ex. 110; Belcher 49:25-51:10, Ex. 5). At this meeting, FGCU clearly explained that Dean Henry made a final decision on May 6, 2009. (Id.). It then provided notice to Plaintiff in writing on August 28, 2009. (Pl. I 246:7-10, Ex. 109 at Bates 002610-16; Belcher 32:11-15). Even if Plaintiff's deadline to file her charge began running on August 17, 2009, or August 28, 2009, her June 30, 2010, charge was still untimely.

[40] Likewise, in ruling on Defendant's previous Motion to Dismiss, this Court previously recognized the well settled authority that "the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations period." (Order (Dkt. No. 21 at 7-8)).

suggestion that the statute of limitation be extended because the provost's decision was subject to appeal and review by the university's president. Id. In affirming the district court's decision, the Fifth Circuit noted that the limitations period is not tolled or affected by the pendency of a review/appeals process, particularly when the plaintiff could have commenced a Title VII lawsuit notwithstanding that review. Id.

The Seventh Circuit also affirmed the dismissal of a professor's discrimination claim as time-barred when she failed to file her charge within 300 days of the dean's decision. In Lever v. Northwestern Univ.,[41] the plaintiff, a sociology professor in the defendant's college of arts and sciences was considered for tenure. 979 F.2d 552, 553-56 (7th Cir. 1992). While plaintiff's department recommended her for promotion, a university committee did not recommend plaintiff for tenure by one vote. Id. at 553. On May 5, 1980, the college of arts and sciences' dean informed the plaintiff that he would not recommend to the university's provost that she receive tenure and, therefore, her employment would end a year later. Id. Subsequently, on February 12, 1981, the defendant's provost notified the plaintiff that he would not reverse the dean's decision and would not recommend plaintiff for promotion to tenure. Id. The professor, like Plaintiff in this case, filed an EEOC charge within 300 days of the provost's letter, but not within 300 days of the dean's letter. Id.

After the district court concluded that the dean's decision was definitive and entered judgment in the defendant's favor, the professor appealed, arguing that an ambiguity in the university's policies regarding whether the dean or provost was the decision maker provided

---

[41] The Eleventh Circuit cited this decision with approval in Everett v. Cobb County School Dist., 138 F.3d 1407, 1410 (11th Cir. 1998).

grounds to calculate the 300-day deadline from the provost's letter.  Id.  Rejecting plaintiff's argument, Judge Easterbrook explained,

> [the plaintiff] contends that ambiguity necessitates generosity – that the court should choose the last of the plausible dates, to preserve the claims of persons who believe that they are victims of discrimination.  Doubtless courts should consider the effects of uncertainty.  Still, a legal rule starting the time on the latest possible date cuts against the grain of [Del. State College v. Ricks, 449 U.S. 250, 258 (1980)] and other decisions we are bound to follow.  Congress chose a short period of limitations for employment-discrimination cases, providing employers with a valuable entitlement offsetting the portions of Title VII that assist employees, and courts may not second guess that decision.  No rule of law says that employees win all close cases.

Id. at 554.  In reaching this decision, the court was persuaded by testimony provided by the dean and provost who, like Dean Henry and Dr. Toll, testified that the dean's decision was final and self-effectuating.  Id. at 555.  The court was also persuaded by the plaintiff's own actions, which similar to Plaintiff's actions in this case, suggested that she knew that the dean's decision was final.[42]  Id.

Thus, the overwhelming and undisputed evidence from the testimony of Dean Henry, Dr. Toll, and Dr. Rogers, the contemporaneous writings, as well as the FPED's and PECAP's express language establish that Dean Henry made a final decision on May 6, 2009, which was conveyed unequivocally to Plaintiff by a letter dated the same day.  In addition to the undisputed facts, the case law further supports the conclusion that Plaintiff's claims are time-barred.  For this reason alone, Defendant is entitled to judgment as a matter of law.

---

[42] Moreover, any ambiguity or uncertainty regarding Defendant's policies ended on August 17, 2009, when Defendant rejected any interpretation that Dean Henry did not make a final decision.

**B.      Plaintiff Did Not Administratively Exhaust Her National Origin Claim**

Even if Plaintiff's claims are not time barred, Plaintiff failed to administratively exhaust her national origin claim.  Indeed, Plaintiff's June 30, 2010, charge and July 8, 2010, amended charge plainly reveal no basis upon which to suggest that an alleged motivating factor for Plaintiff's termination was her national origin.  (See Composite Exhibit A at Bates 500024-25).  To the contrary, the charges are quite specific, alleging race, sex, age, and retaliation only.  (Id.).

It is established that "[a] plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  Hillemann v. University of Central Florida, 167 F. App'x 747, 749 (11th Cir. 2006) (citing Gregory, 355 F. 3d at 1280).  Indeed, the Eleventh Circuit has recognized "that the [EEOC] should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts."  Gregory v. Georgia Dep't of Human Resources, 355 F.3d 1277, 1279 (11th Cir.2004).  A plaintiff is not permitted to raise allegations of any new acts of discrimination in judicial proceedings.  Id. at 749 (citing Wu v. Thomas, 863 F. 2d at 1543, 1547 (11th Cir. 1989)).  In this case, Plaintiff's national origin discrimination claim based on her U.S. born status is not at all like or related to her claims that the alleged motivating factors for her termination were gender, race, age, or retaliation.  Plaintiff seeks to bring a whole new theory of discrimination to bear, with nothing in her charges even remotely suggesting a national origin bias.  More importantly, while the intake questionnaire and related documents that Plaintiff submitted to the EEOC may contain vague references foreign

born professors, the EEOC's investigatory file clearly reflects that the EEOC's investigation excluded issues concerning Plaintiff's national origin.

The EEOC only requested information from Defendant concerning Plaintiff' race, sex, and age.  (Composite Exhibit A at Bates 500042-43, 46).  Additionally, in corresponding with Plaintiff concerning her charge and Defendant's responsive position statement, the EEOC limited its discussion to issues concerning Plaintiff's age, sex, and race.  (Id. at Bates 500022).  Despite this, Plaintiff took no steps to inform the EEOC that she also was asserting a national origin claim nor did she request that the EEOC investigate that claim.  Moreover, the EEOC confirmed in an October 28, 2013, Recommendation for Closure Memorandum that it did not investigate a claim of national origin discrimination.  (Id. at 500009).

Defendant should not have to defend against a claim that the EEOC itself did not investigate, particularly since Defendant was not afforded an opportunity to respond to that claim at the administrative level.  Allowing Plaintiff to proceed on her national origin claim would undermine the established statutory requirement that she first exhaust her administrative remedies.  Accordingly, Plaintiff failed to administratively exhaust her national origin claim and it must be dismissed.

**C.     Plaintiff Fails to State a Claim for Discrimination Under Title VII**

Even if Plaintiff could overcome these procedural bars, Plaintiff's discrimination claims nonetheless fail as she is unable to advance any evidence of discrimination.  At all times, Plaintiff bears the ultimate burden of establishing intentional discrimination and retaliation.  See Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).  As Plaintiff cannot present any direct evidence of discrimination, in order to defeat this motion, she must satisfy

the McDonnell Douglas burden-shifting analysis. See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004). Plaintiff cannot meet her burden, however, because she cannot establish that she was subjected to disparate treatment and cannot establish that Defendant's legitimate business reasons for not renewing her CMYA were pretext for unlawful discrimination.

Following the Court's Order on Defendant's Motion to Dismiss (Dkt. No. 21), the only adverse action upon which Plaintiff can advance her discrimination claims is the nonrenewal of her contract. (See Order (Dkt. No. 21)). None of Plaintiff's allegations relating to her CMYA nonrenewal, however, are sufficient to state a claim of race, gender, or, national origin discrimination. First, Plaintiff cannot identify any similarly situated employee outside of her protected classes who exhibited the same performance problems as Plaintiff and whose CMYA was renewed. See McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008) (explaining that the quantity and quality of the comparator's misconduct must be nearly identical to that of the plaintiff). In particular, Plaintiff has not and cannot identify another faculty member who maintained inaccurate syllabi, failed to complete routine paperwork, had numerous students complaints, had a student successfully appeal a grade based on incomplete syllabi, improperly administered multiple SAIs, refused to provide a sabbatical report upon request, and failed to satisfy the requirements of a PIP and whose contract was renewed.

Plaintiff does not dispute that she had performance deficiencies, including omitting provisions from her syllabi as required by her PIP.[43]  (Pl. I 141:9-142:13, 151:3-155:13, 159:6-162:12, 195:13-203:25; Pl. II 36:15-40:3, 48:24-49:1).  Plaintiff also admits that she cannot identify anyone who had a similar number of student complaints.  (Pl. I 65:24-66:6, 207:24-208:3).  She further concedes that she did not administer one SAI as the PIP required. (Pl. I 242:23-243:8, 243:4-19; Pl. II 21:9-12, Ex. 115 at Bates 004201).  She also admits that she refused to provide Dean Henry a copy of her sabbatical report and failed to submit her sabbatical report to the provost's office.  (Pl. I 101:13-103:7; Pl. II 58:4-9).

Plaintiff must rebut head on each and every reason for her termination, and she has failed to do so.  See Shultz v. Sec'y of U.S. Air Force, 522 F. App'x 503, 504-05 (11th Cir. 2013) (requiring the plaintiff to prove each reason for termination is pretext for discrimination); Chapman v. AI Transport, 229 F.3d 1012, 1037 (11th Cir. 2000) (same).  At best, Plaintiff can only identify an individual who had one of the many performance deficiencies she had, but that is not enough to make him/her similarly situated, as she does not identify any other person with all of the same performance problems.[44]  Plaintiff does not even identify another faculty member who was on a PIP, failed to satisfy at least some of the requirements, and was renewed.

---

[43] Plaintiff does not dispute that some of these required syllabi provisions, including provisions on attendance and make up exams/late papers were specifically delineated in her PIP and that she needed to include them in her AY 2008-2009 syllabus.  (Pl. II 44:19-22, 45:16-46:5).

[44] Plaintiff attempts to conduct her own review of other professors' syllabi to point out that those syllabi omitted information which she omitted from her syllabi.  However, there is no evidence that Dean Henry or Dr. Toll were aware of those syllabi.  Moreover, there is no evidence that any of these individuals were on a PIP because of numerous student complaints and a successful grade appeal.  Furthermore, Plaintiff admitted that she did not print out or circulate to her students on the first day of class a full and complete syllabus.  (Pl. II 47:18-53:10, 48:21-23).  Even if she could rely on online course descriptions to substantiate her compliance with the PIP, she admits that she did not give those course descriptions to her students on the first day of class as the PIP required.  (Id.).

To the extent that Plaintiff seeks to establish a prima facie case of discrimination by relying on Dr. Meij's hiring, her argument is misplaced.  Dr. Meij was not Defendant's first choice to fill the vacant sociology position.  (Strahorn 68:13-74:11, Ex. 22-23).  Rather, Defendant first offered the position to Dr. Bywater who turned down the position.  (Strahorn 68:13-74:11, Ex. 22-23).  Plaintiff cannot establish a prima facie case of discrimination under such circumstances.  See e.g., Hall v. Michigan State Police Dep't, 290 F. App'x 913, 917 (6th Cir. 2008).

Moreover, Plaintiff cannot establish that any of Defendant's reasons for terminating her were pretext for discrimination.  Plaintiff cannot identify any weaknesses, implausibilities, inconsistencies, or contradictions in Defendant's legitimate reasons that a reasonable factfinder could find unworthy of credence.  See Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir. 2005).  Plaintiff admits that Dean Henry and Dr. Toll believed she engaged in the foregoing performance deficiencies that warranted her termination.  (Pl. II 51:11-17, 62:17-24).  The only evidence that she articulates to support her claims of discrimination is her subjective belief,[45] which is not sufficient to defeat summary judgment.  See Wallace v. Teledyne Cont'l Motors, 138 F. App'x 139, 143 (11th Cir. 2005).

Indeed, Plaintiff cannot identify any comments made by Defendant regarding her race, gender, or national origin.  She cannot point to anyone outside of her protected classes

[45] To the extent that Plaintiff argues that Defendant's 2010 diversity climate study establishes pretext, the climate study was a blind, anonymous survey, completed after Dean Henry's decision, which did not pertain to Plaintiff's particular employment.  (Pl. II 107:3-6, 110:13-16).  Likewise, to the extent that Plaintiff seeks to establish pretext by suggesting that she was the only ranking faculty member of African American descent in the CAS and that Defendant failed to hire other African American candidates, she does not identify any of those candidates.  (Pl. II 114:10-117:2, 118:15-21).  Moreover, Plaintiff does not assert that she is the only African American professor at FGCU.  (Pl. II 114:21-23, 115:10-14).

who exhibited similar performance problems and maintained their CMYA.  She cannot point to any evidence whatsoever suggesting that Dean Henry or Dr. Toll, both whom worked with Plaintiff for many years, were motivated by any discriminatory motive.[46]  Throughout her long career with Defendant where she was repeatedly given favorable treatment, Plaintiff's race, gender, or national origin never changed.[47]

In light of Plaintiff's admissions and the lack of any evidence demonstrating pretext, Plaintiff's discrimination claims must fail.  See Kragor v. Takeda Pharm. Am., Inc., 702 F.3d 1304, 1307 (11th Cir. 2012) ("When a plaintiff chooses to attack the veracity of the employer's proffered reason, '[the] inquiry is limited to whether the employer gave an honest explanation of its behavior'") (citing Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)).

### D.    Plaintiff Fails to State a Claim for Retaliation

Plaintiff also cannot point to any evidence demonstrating that Defendant retaliated against her.  First, Plaintiff cannot show that she engaged in statutorily protected activity. Plaintiff's statements to Dean Henry and Dr. Toll that Dr. Strahorn was "biased" as well as her statements to Dr. Toll and President Bradshaw that Dr. Strahorn "harassed" her are generalized complaints which do not constitute protected activity under Title VII.  See Jeronimus v. Polk Cty. Opportunity Council, Inc., 145 F. App'x 319, 326 (11th Cir. 2005)

---

[46] Were this Court to conclude that Dr. Toll's September 4, 2009, decision served as the final decision on Plaintiff's CMYA, such a conclusion would further warrant the dismissal of Plaintiff's discrimination claims. Indeed, Dr. Toll's primary role with respect to Plaintiff was to review the records presented to him and to determine whether Plaintiff complied with her AY 2008-2009 PIP.  Unlike Dean Henry, Dr. Toll oversees hundreds of faculty members and interacted with Plaintiff very infrequently.  (Toll 53:23-54:6).  Plaintiff has presented no evidence that Dr. Toll was motivated to discriminate against Plaintiff.

[47] The only thing that changed was Plaintiff's performance.  To the extent that Plaintiff contends that Defendant was motivated by age discrimination, she has not brought such a claim and this allegation further undermines her claims of gender, race, and national origin.  Indeed, Plaintiff admitted that she does not believe Dr. Toll and/or Dean Henry were motivated by gender or national origin animus.  (Pl. II 108:15-109:4, 109:24-114:15).

(finding no protected activity where the plaintiff complained of being subjected to "a campaign of harassment" and working in a "hostile environment").[48]

Even if Plaintiff could establish that she engaged in protected activity, there is no causal connection between her alleged protected activity and termination. As an initial matter, the alleged decision makers were not aware of any complaint. Plaintiff never complained to Dean Henry or Dr. Toll about race, gender, or national origin discrimination. (Pl. II 14:17-16:9; Henry 222:23-223:9; Toll 124:14-19, 130:2-15). In fact, Plaintiff admits that the only individual to whom she ever complained of discrimination was Dr. McKinney, who was not a decision maker, and there is no evidence that Dean Henry or Dr. Toll had knowledge of this complaint. (Pl. II 106:5-107:2). Furthermore, Plaintiff submitted her complaint to Dr. McKinney <u>after</u> Dean Henry had rendered her final decision.

Even if Plaintiff's generalized complaints to Dean Henry and Dr. Toll could be construed as protected activity, Plaintiff sent her letter to Dean Henry more than four months before Dean Henry issued her May 6, 2009, decision and sent her letter to Dr. Toll more than six months before he affirmed Dean Henry's decision on September 4, 2009. Plaintiff cannot establish the requisite causal connection between her complaint and subsequent termination under such circumstances. <u>See</u> <u>Thomas v. Cooper Lighting, Inc.</u>, 506 F.3d 1361, 1364 (11th Cir. 2007) (noting that a three month disparity between protected activity and an adverse action cannot establish a causal connection).

Furthermore, as noted above, Defendant had legitimate, nondiscriminatory reasons for terminating Plaintiff, and there is no evidence to show that those reasons were pretext for

---

[48] Dean Henry and Dr. Toll both testified that they did not construe these terms as indicative of discrimination. (Toll 58:16-61:7; Henry 221:24-223:1, 226:14-25).

retaliation.   Indeed, there is no evidence that Dean Henry or Dr. Toll ever mentioned Plaintiff's purported complaints or made any retaliatory remarks.   Instead, Defendant terminated Plaintiff for her own wrongful conduct.  Thus, Plaintiff's retaliation claim fails as a matter of law.

**III.**   **CONCLUSION**

Defendant respectfully requests that this Court enter judgment in its favor.

Dated this <u>19th</u> day of January, 2016.

Respectfully submitted,

<u>*/s/ Sacha Dyson*                                    </u>
SACHA DYSON
Florida Bar No. 509191
sdyson@tsghlaw.com
JEFFERY L. PATENAUDE
Florida Bar No. 0070215
jpatenaude@tsghlaw.com
Thompson, Sizemore, Gonzalez,
  & Hearing, P.A.
One Tampa City Center
201 North Franklin Street, Suite 1600
Tampa, Florida 33602
Telephone: (813) 273-0050
Facsimile: (813) 273-0072
Attorneys for Defendant
 Florida Gulf Coast University

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing this 19th day of January, 2016, to the following:

    Cynthia N. Sass and Yvette D. Everhart,
    Law Offices of Cynthia N. Sass, P .A.
    601 West Dr. Martin Luther King, Jr. Blvd
    Tampa, Florida 33603

    and

    Peter F. Helwig, Esquire
    Harris & Helwig, P.A.
    6700 South Florida Avenue, Suite 31
    Lakeland, Florida 33813

                                      **/s/ Sacha Dyson**
                                        Attorney