UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

E. VALERIE SMITH,

      Plaintiff,

v.                                    Case No: 2:14-cv-50-FtM-29MRM

FLORIDA     GULF     COAST
UNIVERSITY     BOARD     OF
TRUSTEES,

      Defendant.

_____

**OPINION AND ORDER**

This matter comes before the Court on the defendant Florida Gulf Coast University Board of Trustees' Motion for Summary Judgment (Doc. #64) filed on January 19, 2016. Plaintiff filed an Opposition (Doc. #79) on February 16, 2016.[1]

On December 23, 2014, the Court issued an Opinion and Order (Doc. #21) granting defendant's Motion to Dismiss Complaint as to the portions of Counts I, II, and III of the Amended Complaint (Doc. #8) finding that the adverse actions resulting in a denial of a raise and being placed on probation were both time barred, but the case could proceed as to the nonrenewal and termination of employment. Count I of the Amended Complaint alleges that the

_____

[1] Plaintiff thereafter filed two Notices of Scrivener's Error to Correct Plaintiff's Opposition. (Docs. ## 81, 82.)

nonrenewal of plaintiff's employment contract, resulting in her termination, was race discrimination under Title VII; Count II alleges that these actions were national origin discrimination under Title VII; and Count III alleges that these actions were gender discrimination under Title VII. Count IV alleges a claim of retaliation under Title VII.

## I.

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Baby Buddies, Inc. v. Toys "R" Us, Inc., 611 F.3d 1308, 1314 (11th Cir. 2010). A fact is "material" if it may affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A court must decide 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Anderson, 477 U.S. at 251).

In ruling on a motion for summary judgment, the Court views all evidence and draws all reasonable inferences in favor of the non-moving party. Scott v. Harris, 550 U.S. 372, 380 (2007); Tana

v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010).  However, "if reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." St. Charles Foods, Inc. v. America's Favorite Chicken Co., 198 F.3d 815, 819 (11th Cir. 1999) (quoting Warrior Tombigbee Transp. Co. v. M/V Nan Fung, 695 F.2d 1294, 1296 (11th Cir. 1983) (finding summary judgment "may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts")).  "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." Allen v. Bd. of Pub. Educ., 495 F.3d 1306, 1315 (11th Cir. 2007).

## II.

### A. Florida Gulf Coast University (FGCU)

Florida Gulf Coast University (FGCU) is a public university with several colleges, including the College of Arts and Sciences (CAS).  (Doc. #8 & Doc. #22, ¶ 5; Doc. #64, p. 3.)  Within CAS are several departments, including the Department of Behavioral and Social Sciences (the DBSS).  (Doc. #8 & Doc. #22, ¶ 14; Doc. #64, p. 4.)  The majority of CAS's faculty, including plaintiff, are engaged under a three-year rolling Continuing Multi Year Appointment (CMYA) contract and evaluated annually at the end of the academic year (August – May).  (Doc. #75-3, p. 101.)

Plaintiff E. Valerie Smith (Smith or plaintiff) is an African-American female born in the United States.  (Doc. #8 & Doc. #22, ¶ 7.)  In September 1996, plaintiff joined FGCU as a founding faculty member and professor of sociology, and was hired on a CMYA. (Id. at ¶¶ 9, 12.)  In or around 2005, Dr. Eric Strahorn (Chair Strahorn) became plaintiff's supervisor and the Chair of the DBSS. (Doc. #64, p. 4; Doc. #79, p. 17.)

During the relevant academic years, Dr. Donna Price Henry (Dean Henry) was the Dean and chief academic officer for CAS, and responsible for managing and overseeing the Department and department chairs, including Chair Strahorn, and then Dr. Joseph Cudjoe (Chair Cudjoe) who became chair in 2008.  Dean Henry reported to FGCU's provost or Vice-President of Academic Affairs (VPAA), Bonnie Yegidis (Provost Yegidis), and later to Dr. Ronald Toll (Provost Toll) who took the position in 2008.  The provost reports directly to the President, Dr. Wilson Bradshaw (President Bradshaw).  (Doc. #64, p. 4; Doc. #79, pp. 4, 6.)

Three documents relate to the evaluation of CAS faculty:  (1) FGCU's Collective Bargaining Agreement (CBA), which sets wages, hours, and terms and conditions of employment, Doc. #75-3, p. 58; (2) FGCU's Faculty Performance Evaluation Document (FPED), which sets forth the procedures and standards for evaluating faculty, Doc. #72-2, p. 14, Exh. 4; and (3) CAS's Performance and Evaluation Criteria and Process (PECAP), Doc. #65-9, p. 27; Doc. #72-2, p.

80, Exh. 6, which covers procedures and standards for evaluating faculty within CAS to the extent that the document does not contradict or invalidate the university-wide Faculty Performance Evaluation Document. The FPED controls over any inconsistent provision of the PECAP, and the CBA overrides both documents.  If the FPED is silent or unspecific on any matter that is addressed by the PECAP, the authority of the PECAP is not restricted.  (Doc. #66-2, Belcher 1, p. 5, § 2.2.1.)   Thus, the hierarchy of the relevant documents is the CBA, the FPED, and then the PECAP.

### B. Faculty Evaluation Process

On May 6th of each year, at the beginning of the evaluation period, the faculty member submits a Performance Development Plan (PDP) outlining the individual's academic goals and objectives for the next academic year, including teaching, scholarship, and service. (Doc. #75-3, Toll Exh. 12, p. 11.) By March 31st of the academic year, faculty members must submit an Annual Professional Development Report (Development Report) to their department chair outlining how they met their PDP, and include the course syllabi, student evaluations, scholarly works, and community activities. Additional documentation may be submitted until April 23rd. (Id.) By April 30th, after review of the Development Report and conferring with the faculty member, the department chair must issue a Performance Review Report (Performance Report) to the faculty member summarizing the faculty member's performance.  By May 31st,

an evaluation conference between the faculty member and supervisor must take place to review the Performance Report for the concluding evaluation year, and the Development Report for the new evaluation year. (Id.)  The Final PDP is completed and signed by September 30th of the following academic year. (Id., Toll Exh. 12, p. 12; Toll Exh. 20, p. 203.)

If the faculty member receives an "overall satisfactory" Performance Report, the faculty member receives a one-year contract extension, thereby maintaining a full three-year contract cycle. (Id., Toll Exh. 12, p. 13; Toll Exh. 20, p. 202.)  If not, the faculty member is placed on one-year of probation to remedy deficiencies, with no contract extension added for the duration of the probationary period. (Id.)  This may be appealed through the Peer Review Committee (PRC). (Id., Toll Exh. 12, p. 14; Toll Exh. 20, p. 202.)

During probation, and by September 30th, the faculty member must draft a one-year Performance Improvement Plan (PIP) or Performance Improvement Contract (PIC) to address deficiencies, set forth objectives, and identify a plan of action for the academic year.  This PIP takes the place of the PDP for the next evaluation period.  By March 15th of the probationary academic year, the faculty member must have submitted a Development Report-PIC to their supervisor demonstrating fulfillment of the PIP. Two weeks thereafter, by March 31st, the supervisor submits a

recommendation to the PRC for CAS with regard to whether the faculty member satisfied the PIP.  By April 30th, the PRC submits its evaluation and recommendation to the dean, who makes the final decision on whether the faculty member satisfied the PIP and whether the faculty member should return to a full three-year CMYA. (Doc. #64, pp. 6-7.)

By May 6th, the dean makes the final decision based on the recommendations and provides written notice of renewal or nonrenewal to the faculty member.  If the dean decides not to renew the contract, or if the dean's decision is different than the recommendations of the PRC, by June 1st the dean must provide a written report or dissenting report to the provost regarding the decision.  The dean's decision may be appealed to the provost, and the provost retains authority to review and modify the final decision of the dean.  (Id., pp. 7-8.)

### C. Plaintiff's Past Academic Years: 1996 to 2007

#### (1)  Academic Years 1996 to 2005-06

For her 1997-1998 Annual Evaluation, plaintiff received an overall rating of exceeds expectations and signed and attached her statement in response on March 26, 1999.  (Doc. #65-4, Def. Exh. 1, pp. 1-3.)  Until the academic year 2005-2006, plaintiff generally received satisfactory evaluations, and mostly excellent

or very good student assessments with a few anomalies.[2]  (Doc. #64, p. 9; Doc. #65-4, Def. Exhs. 5-10, pp. 219-256.)

### (2) Academic Year 2006-07

Starting from the 2006-2007 academic year going forward, plaintiff started receiving increased low ratings from students and was late submitting her Development Report.  The Annual Evaluation for the Summer 2006-Spring 2007 found that plaintiff overall did not meet expectations, and that no Development Report had been submitted "despite multiple requests and reminders." (Doc. #65-4, Def. Exh. 27, pp. 148-49.)  In his June 7, 2007 letter to plaintiff, Chair Strahorn expressed that Smith had failed to meet some of the basic requirements of the position, including: difficulty meeting routine deadlines, a lack of accessibility, and failing to provide even colleagues and her supervisor with routine information in a timely fashion.  (Id., p. 148.)  On June 20, 2007, Chair Strahorn signed the second page to indicate that plaintiff had refused to sign the Annual Evaluation.  (Id., p. 149.)  On

---

[2] For example, for Spring 1999, the Student Assessment for The African-American Experience Course was 100% "Excellent", Doc. #65-4, Def. Exh. 5, p. 223, but for Fall 2000, the Student Assessment for the Multicultural Issues Course reflects a split between "Very Good" and "Fair", but no "Excellent" ratings and several "Poor" ratings, id., Def. Exh. 7, p. 228.  The Spring 2005 Latin American Experience Course shows Student Assessments in all categories, while the Fall 2005 Medical Sociology Course and Spring 2006 Caribbean Social Structures Course show mostly "Excellent" assessment responses.  (Id., Def. Exhs. 10-11, pp. 248, 252, 254.)

June 20, 2007, plaintiff emailed Chair Strahorn apologizing that her Development Report was late, citing reasons including sickness and no access to materials while in Brazil. (Id. at Def. Exh. 28, p. 150.)  On June 21, 2007, plaintiff finally submitted her Development Report. (Id. at Def. Exh. 43, p. 176.)  Chair Strahorn acknowledged receipt on June 25, 2007. (Id. at Def. Exh. 30, p. 158.)

By email dated September 14, 2007, Chair Strahorn responded that plaintiff's evaluation would not be revised, and that she had missed the chance to work with him to put together a PIP, but that she was welcome to work with him to craft the PIC, which would be similar to past PDPs. (Id. at Def. Exh. 42, p. 175.)  On October 9, 2007, Chair Strahorn emailed plaintiff to remind her that the deadline to submit a PIC had passed, and if not received by October 12, 2007, he would "have no choice other than to finalize the document without [plaintiff's] input." (Id. at Def. Exh. 44, p. 204.)

By letter dated October 10, 2007, to Dean Henry and Provost Yegidis, plaintiff submitted a portfolio and memo as an attachment to her evaluation to appeal the evaluation. (Id. at Def. Exh. 43, p. 176.)  On October 12, 2007, Chair Strahorn acknowledged receipt of plaintiff's PDP. (Id. at Def. Exh. 46, p. 208.)  After repeated emails from Chair Strahorn, on October 25, 2007, plaintiff submitted her PIP. (Id. at pp. 208-10, Def. Exhs. 46-48 & p. 211,

Def. Exh. 49.)  On November 29, 2007, Chair Strahorn provided a corrected version of his Performance Report, dated November 7, 2007, finding that plaintiff overall met expectations.  (<u>Id.</u> at Def. Exh. 45, pp. 205-207.)

> *(3)* **Academic Year: 2007-2008**

For the 2007-2008 academic year, complaints from students continued and increased, <u>see, e.g.</u>, Doc. #65-7, pp. 1-36; Doc. #65-6, pp. 1-87, and plaintiff also continued to submit documents late.  On March 24, 2008, Chair Starhorn sent an urgent reminder email to staff regarding the March 31, 2008 deadline for all full-time faculty to submit their Development Reports, and the additional deadlines leading to the submission of the final PDP. (Doc. #65-6, Def. Exh. 65, p. 88.)  By email dated April 1, 2008, plaintiff submitted her Development Report to Chair Strahorn.  (<u>Id.</u> at Def. Exh. 66, p. 89.)  Chair Strahorn noted there was an error that needed correction, and after having been out of town, on April 24, 2008, plaintiff emailed Chair Strahorn her revised Development Report, and updated CV.  (<u>Id.</u> Def. Exh. 67, p. 93.)  A few minutes later, plaintiff sent another email asking Chair Strahorn to disregard the earlier submission as revisions and updates were required.  (<u>Id.</u> at Def. Exh. 69, p. 105.)

On April 30, 2008, Chair Strahorn provided plaintiff a copy of the Performance Report, and highlighted that May 31, 2008 was set aside for evaluation conferences between supervisor and

faculty.  (Id. at Def. Exh. 70, p. 106; Doc. #65-7, Def. Exh. 91, p. 52.)   This time, Chair Strahorn's Performance Report found plaintiff overall did not meet expectations (Doc. #65-6, Def. Exh. 70, p. 107) requiring plaintiff to submit a PIP for the next academic year of 2008-2009 rather than a regular PDP (id. at Def. Exh. 75, p. 116).   Plaintiff did not sign the Performance Report, and Chair Strahorn signed the Report on August 5, 2008, indicating the refusal to sign.  (Id. at Def. Exh. 79, p. 126.)   Plaintiff sent Chair Strahorn additional documentation in a bid to change his mind, but he responded that no substantive changes would be made.  (Doc. #65, Plaintiff Dep. 186:23.)   By email dated June 2, 2008, Chair Strahorn reminded plaintiff about her right to appeal to the dean.  (Doc. #65-6, Def. Exh. 75, p. 116.)   By email dated July 15, 2008, Chair Strahorn provided plaintiff with a PIC because plaintiff did not submit a timely PIP.  (Id. at Def. Exh. 76, p. 118.)

Pursuant to a Memorandum dated July 21, 2008, to Provost Toll from President Bradshaw, Provost Toll was designated as the President's designee for purposes of administering and executing FGCU's academic agreements, approving personnel actions, and acting in the President's absence.  (Doc. #65-9, Def. Exh. 106, pp. 21-22.)   This delegation of authority included approval of a faculty contract renewal or nonrenewal.  (Doc. #66, Belcher Dep.

45:12-18.)  In August 2008, Chair Cudjoe took over the role Chair Strahorn had held.

### (4)  Academic Year 2008-2009; Plaintiff's Termination

By Memorandum dated December 18, 2008, to Dean Henry, plaintiff took issue with her Performance Report and with Chair Strahorn.  (Doc. #65-7, Def. Exh. 90, pp. 36-42.)  By Memorandum dated February 23, 2009, to Provost Toll, plaintiff requested a meeting to discuss her evaluations over the previous two years, and for enclosed materials to be placed in her personnel file. (Id. at Def. Exh. 91, p. 43.)

On March 12, 2009, Chair Cudjo emailed plaintiff to follow-up on the completion of her PIC and to remind her of the upcoming deadline for her to submit her documentation.  (Id. at Def. Exh. 93, p. 62.)  On March 27, 2009, Chair Cudjoe provided his Probation Review to the Chair of the PRC, in light of former Chair Strahorn's overall evaluation of unsatisfactory.  (Id. at Def. Exh. 94, p. 65.)  Chair Cudjoe recommended to the PRC that plaintiff's probationary status be removed and her status be changed back to a CMYA because the expected areas for improvement were administrative in nature, plaintiff had shown improvement in the conditions of the PIC, and plaintiff was making a deliberate effort to improve.  (Id. at pp. 65-66.)

By Memorandum dated April 21, 2009, Provost Toll notified plaintiff that her Performance Report for 2007-2008 would remain

unchanged and retained, and that she would not now be permitted to add her comments since, as of August 2008, plaintiff had refused to sign the Performance Report and it was not until December 18, 2008, that she had requested a meeting with the next higher level administrator.  (Doc. #65-7, p. 133, Def. Exh. 97.)

By letter dated April 21, 2009, the PRC notified Dean Henry that they reached the conclusion that plaintiff had satisfied the requirements of the PIC, and that they concurred with Chair Cudjoe that her probationary status be removed and plaintiff return to a CMYA.  (Doc. #65-8, Def. Exh. 98, p. 1.)

In an email dated May 1, 2009, to plaintiff, Dean Henry indicated that she had reviewed the APDR-PIC, and the input of the PRC and Chair Cudjoe.  Dean Henry requested that plaintiff submit additional supporting materials required by the PECAP, including a Development Report, by May 5, 2009.  Otherwise, a decision regarding renewal would be made based on the current submissions.  (Doc. #65-8, Def. Exh. 101, pp. 7-8; Doc. #65-9, p. 119.)  On May 4, 2009, Dean Henry directed an employee to print and place the email in plaintiff's mailbox.  (Id., p. 7; id., p. 119.)

In a letter dated May 6, 2009, Dean Henry notified plaintiff:

> That you have overall unsatisfactory performance for the 2008-2009 academic year. Consistent with the Collective Bargaining Agreement Articles 15.1 D. and 12.2 A., I am giving you notice that your current contract will not be renewed beyond the May 6, 2010

> date.   No   further   notice   of   cessation   of
> employment is required.

(Doc. #65-8, Def. Exh. 103, p. 11.)

Plaintiff did not consider herself terminated based on this letter because, in her view, it did not follow proper procedure. (Doc. #65, Plaintiff Dep. 236:9-21.)  In a Memorandum dated May 12, 2009, plaintiff made an internal grievance to the Grievance Committee Chair of the United Faculty of Florida (UFF) against Dean Henry for failure to adhere to the procedures in the Collective Bargaining Agreement.  (Doc. #65, Plaintiff Dep. 239:8-14; Doc. #65-8, Def. Exh. 105, p. 18.)

In a letter dated May 18 and 19, 2009, to plaintiff, Dean Henry referenced the May 6, 2009, letter and plaintiff's May 7, 2009, e-mail requesting a basis for the decision, and provided her "rationale" for the overall unsatisfactory performance.  (Doc. #65-9, Def. Exhs. 108-109, pp. 98, 166, 179, 258.)  On May 19, 2009, plaintiff sent an email request for informal resolution to Provost Toll, which was acknowledged.  (Id. at Def. Exh. 109, pp. 172, 174.)  By letter dated May 22, 2009, Dean Henry submitted her "Dean's Report" to Provost Toll serving as her "dissenting report" for a final decision for renewal or non-renewal of plaintiff's contract.  It was noted that the documents were submitted to Provost Toll "for final decision for renewal or non-renewal of [plaintiff's] contract."  (Id., p. 178.)

14

An informal resolution meeting was held on May 29, 2009, with plaintiff, two United Faculty of Florida (UFF) representatives, and an Associate Provost for Academic Affairs in attendance. At a second informal resolution meeting held on July 14, 2009, Dean Henry and the Appointed Mediator joined in attendance. (Doc. #65-9, Def. Exh. 109, pp. 203, 274.) On or about July 16, 2009, the informal resolution process was concluded because the dispute could not be resolved, thereby allowing plaintiff to proceed with the filing of a grievance. (Id., p. 195.)

On July 23, 2009, plaintiff filed her Step 1 Grievance. (Id., p. 201.) It was agreed that the Step 1 decision requirement would be extended from August 21, 2009 to August 28, 2009. (Id. at Def. Exh. 110, p. 268.)

On August 17, 2009, Dean Henry emailed the Director of Human Resources for FGCU, Steve Belcher, a copy of her May 19, 2009 letter to plaintiff providing the basis for her decision of nonrenewal in response to plaintiff's email. (Id. at Def. Exh. 109, p. 256-259.) By letter dated August 28, 2009, Doc. #65-9, Def. Exh. 109, p. 101, FGCU, through Steve Belcher, provided plaintiff the University Step 1 Decision denying the Step 1 grievance originally filed on July 23, 2009, and noting:

> The faculty member did not request a conference with the dean regarding the content of the Dean's report prior to its submittal to the VPAA. Additionally, the faculty member failed to appeal the Dean's decision according

> to the PECAP requirements. Instead the
> faculty member filed for Informal Resolution
> under Article 20 of the CBA.

(Id., p. 108). The decision went on to find that the VPAA (Provost)

had not rendered a decision under the PECAP because plaintiff filed

under Article 20 prior to the Dean providing a response to

plaintiff's request for the basis of the Dean's decision:

> Additionally, the Grievant did not exercise
> her right under the PECAP to schedule a
> conference with the Dean to be informed of the
> content of the Dean's report prior to its
> submittal to the VPAA, opting to instead file
> under Article 20. She did not follow the PECAP
> and file an appeal of the Dean's decision to
> the VPAA. The UFF representative for Dr. Smith
> acknowledged during the Step 1 meeting that
> the grievant prematurely filed the Request for
> Informal Resolution rather than filing an
> appeal directly with the VPAA under the PECAP.
> The Dean provided her dissenting report to the
> Provost on May 22, 2009. Since there is no
> specified timeline for the VPAA's decision
> under the PECAP, the Grievant inappropriately
> filed a grievance alleging that the VPAA did
> not provide a decision.

(Id.) FGCU concluded that both parties failed to take appropriate

action under the respective requirements of the PECAP and the CBA,

and directed the Provost to render a decision on the dean's dissent

within 10 calendar days of the decision. "This directive is

consistent with the PECAP requirement of a final decision by the

VPAA [Provost]." (Id., p. 109.) Plaintiff was not required to

initiate an appeal to the Provost from the Dean's dissenting

recommendation, but it was her right to do so.  (Doc. #66, Belcher Dep. 73:14-74:2.)

By letter dated September 4, 2009, Provost Toll sent plaintiff a letter "[i]n response to the dissenting report from your Dean" stating that after an independent review he found that plaintiff's overall performance for the 2008-2009 academic year was unsatisfactory.  (Id. at Def. Exh. 111, p. 271.)  Plaintiff was notified in the letter that her employment would not be renewed, and she would not be offered further appointment beyond September 8, 2010.  Provost Toll concluded with "[n]o further notice of cessation of employment is required."  (Doc. #65-9, Def. Exh. 106, p. 14.)  Plaintiff was notified of her right to grieve the decision if she believed that there had been a violation of the Collective Bargaining Agreement.  (Id.)

By letter dated September 7, 2009, a Summary of Information Resolution was sent to plaintiff describing the timeline of informal resolution through August 2009.  (Id. at Def. Exh. 112, pp. 272-276.)

### D. Plaintiff's Post-Nonrenewal Actions

### (1) Grievance Proceedings

A FGCU/UFF Grievance form was received in the Office of the Provost on October 20, 2009, indicating that plaintiff was filing a Step 2 Grievance alleging a violation of the Collective Bargaining Agreement and the PECAP.  Informal Resolution was

cancelled in favor of filing the Grievance. (Id. at Def. Exh. 106, p. 18.) A Step Two Decision dated October 20, 2009, found no violations of the Collective Bargaining Agreement. (Id., p. 1.)

On December 2, 2009, plaintiff made a Step 3 Request for Arbitration in connection with the Step 2 decision of FGCU. (Id., p. 282.) On February 3, 2010, a Notice of Intent to Arbitration was provided. (Id., p. 283.) After a hearing on April 12, 2010, the Opinion and Award (id. at Def. Exh. 113, p. 277) found that the two grievances were not in violation of Collective Bargaining Agreement Section 20.15, which provided that "[a] grievance which has been filed at Step 3 and on which no action has been taken by the Grievant or UFF State Office for sixty (60) days shall be deemed withdrawn and resolved in accordance with the decisions issued at the prior step." (Id., p. 280.) More specifically, the arbitrator found that the February 3, 2010 Notice of Intent to Arbitration was not received by FGCU until 75 days from the Step 3 Request for Arbitration, and that the grievance was deemed withdrawn and resolved in accordance with the decision issued at the prior step. (Id. at p. 281.)

**(2) Plaintiff's EEOC Filings**

On June 28, 2010, plaintiff signed and swore her charge of Discrimination to the Equal Employment Opportunities Commission (EEOC) (Doc. #64-3, Composite Exh. A, p. 5), which was stamped received and filed on June 30, 2010. Plaintiff alleged

discrimination against FGCU on the basis of race and age for the period of May 30, 2009 through September 4, 2009.  On July 8, 2010, plaintiff filed an Amended Charge of Discrimination (id. at p. 6) adding sex and retaliation as a basis for discrimination. Plaintiff stated her employment with FGCU would be effectively terminated on September 8, 2010. (Id.)  Neither Charge document included reference to national origin as a basis for plaintiff's claim of discrimination.

On October 28, 2013, a Recommendation for Closure (Doc. #64-3) was issued by the EEOC indicating that the evidence did not support the allegations of discrimination. (Doc. #64-3, Composite Exh. A, p. 3.)  On or about October 31, 2013, plaintiff received her Dismissal and Notice of Rights letter from the EEOC.  The original Complaint herein was filed on January 28, 2014. (Doc. #1; Doc. #8, ¶ 55b.)

**III.**

The Court previously determined that plaintiff's Title VII discrimination claims were limited to the nonrenewal of her CMYA and her resulting termination.  Smith v. Florida Gulf Coast Univ. Bd. of Trustees, No. 214-CV-50-FTM-29DNF, Doc. #21, 2014 WL 7337415, at *4 (M.D. Fla. Dec. 23, 2014).  The preliminary issue is whether these remaining Title VII claims are time-barred. Defendant argues that the Dean's decision dated May 6, 2009, was the final decision which triggered the 300-day filing deadline

with the EEOC.  Plaintiff maintains that the clock did not start until the Provost issued his September 4, 2009 decision.  The Court agrees with plaintiff on this issue.

## A. General Principles

Before filing a Title VII lawsuit, a plaintiff must first file a timely EEOC charge.  Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001).  In a deferral state such as Florida, plaintiff's EEOC charge had to be filed with the EEOC within 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1).  See EEOC v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1271 (11th Cir. 2002).  Only "those claims arising within 300 days prior to the filing of the EEOC's discrimination charge are actionable." Joe's Stone Crabs, Inc., 296 F.3d at 1271. The Supreme Court has said, perhaps unhelpfully, that an unlawful employment practice "occurred" within the meaning of § 2000e-5(e)(1) when it "happened." AMTRAK v. Morgan, 536 U.S. 101, 109 (2002) (hostile work environment claim).  Identifying when the alleged discrimination occurred in this case requires a review of some relevant FGCU procedures and documents.

## B. Renewal or Nonrenewal of Faculty Employment at FGCU

Under the CBA, Article 12, employees are entitled to a one year notice regarding non-reappointment if they have been employed for 2 or more continuous years.  The CBA does not contradict the timeline or steps leading up to notice set forth in the FPED.

(Doc. #75-3, Toll 13, pp. 92-93.)   The Article 20 grievance procedures may take place simultaneously, and the grievant may file an EEOC charge while it is in progress and when it becomes necessary.   (Id., p. 138.)

The process under the FPED for faculty members on a CMYA but placed on probation following the previous year's CMYA extension review is as follows:

- The unit's chief academic administrator [Dean] will make the final decision with respect to the faculty member's evaluation and contract extension based on the recommendations and documentation provided.

- In the event the unit's chief academic administrator [Dean] believes the Peer Review Committee's findings are inconsistent with the unit's evaluation procedures and criteria, that individual [Dean] may contest the Peer Review Committee's findings by providing his or her findings and accompanying documents to the Vice President of Academic Affairs [Provost].

- The faculty member shall have the opportunity to review the final recommendation of his or her unit's chief academic administrator [Dean] and, if dissatisfied with the final recommendation, may provide a written response and appeal to the Vice President of Academic Affairs [Provost] for review of the evaluation.

(Doc. #75-3, Toll 20, p. 204.)   The FPED provides that the unit's chief academic administrator or Dean "must submit written report to the Vice President of Academic Affairs".   (Id.)   Under the FPED,

if the Dean disagrees with the PRC's findings, the Dean may contest the findings by providing the findings to the Provost "with whom the final decision on evaluation and contract extension rests." (Id.)

The FPED process is consistent with the PECAP.  Under § 3.3.1 of the PECAP, as it pertains to the PIC remediation evaluation process by the faculty member's supervisor and the PRC, the Dean communicates the "final decision regarding extension or non-extension of the CMYA."  (Doc. #75-3, Toll Exh. 12, pp. 14-15.) Under §§ 3.3.2 and 3.3.3.4 of the PECAP, the Dean "shall submit" a written report justifying the decision to renew or not renew the faculty member's CMYA to the Provost by June 1st.  The faculty member has the right to schedule a conference with the Dean with regard to the contents of the report prior to its submission, and "[a]ny appeal by the faculty member of the Dean's decision must be directed to the VPAA at this time and in this form."  (Doc. #66-2, Belcher Exh.1, pp. 16, 17.)  Under § 3.3.4 of the PECAP, if the result of the evaluation is nonrenewal,

> . . . and this finding is upheld through any appeal or legal action, then he/she shall remain not in good standing for the duration of the employment contract in effect, and no contract extension shall be offered.  The informal appeal mechanisms of § 3.91 shall be unavailable to faculty members in this instance, since they are replaced by the right of direct appeal to the VPAA [Provost].

(Id., p. 17.)   Under § 3.3.5, if the Dean disagrees with the findings of the PRC, the Dean must submit a dissenting report to the Provost with a copy of the Peer Review Evaluation, and the Provost "shall then render the final decision regarding renewal or nonrenewal."   (Id., pp. 17-18.)   Under the timeline for this process, § 3.4.2, the Dean makes her renewal recommendation to the Provost on or before April 15th, and the Provost "shall inform the faculty member of the final renewal or non-renewal decision" by April 30th.   (Id., p. 19.)

### C. When Alleged Discrimination Occurred in this Case

Plaintiff's supervisor and the PRC concurred that plaintiff's probationary status should be removed and her CMYA renewed.   The Dean and the Provost each rejected this position, declined to renew the CMYA, and terminated plaintiff effective in a year.   Defendant FGCU wants the Dean's decision to be the final, operative "final decision" which triggered plaintiff's obligation to file her claims with the EEOC.   The effect of this would be that the EEOC charges were untimely.

On May 6, 2009, Dean Henry issued her letter finding plaintiff had an "overall unsatisfactory performance", and gave notice to plaintiff that her contract would not be renewed beyond a year from the date of the letter, i.e., that she was terminated effective May 6, 2010.   (Id. at Def. Exh. 103, p. 11.)   In a letter dated May 22, 2009, Dean Henry notified Provost Toll that her

written report would serve as the dissenting report required by 3.3.5 of the PECAP, and that it was being submitted for a "final decision" regarding renewal or non-renewal.  (_Id._, p. 178.) Despite Dean Henry submitting her report in order to obtain a "final decision" from the Provost, FGCU argues that it was really the Dean who made the final decision, albeit subject to the Provost's ability "review and modify".  Thus, defendant stated in part to the Request for Admissions:

> 1.   The final decision regarding the termination for Smith's employment rested with Dr. Ronald Toll.
>
> **Response:**  Denied as phrased. . . .
>
> Upon receipt of either an appeal by the faculty member or a dissenting report or both, Dr. Toll has complete authority to review and modify the final decision of the Dean of CAS. (PECAP at 003927-003928) Dr. Toll also has complete authority to review and modify the CAS Dean's final decision regardless of the CAS Dean's agreement or disagreement with the supervisor or Peer Review Committee ("PRC") and absent either an appeal or a dissenting report. . . .

(Doc. #64-2.)

FGCU employees testified to a different view.  Chair Cudjoe testified that it was his understanding that the final decision has to come from the Provost, specifically in the context of a dissenting report.  (Doc. #70, Cudjoe Dep. 74:8-12; 92:22-93:9.) Mr. Brown, the Chair and a member of the PRC, stated that it was his belief that the Provost would make the final judgment if the

Dean disagrees with the recommendation of the PRC, and that it was an exception that arises when a dissenting opinion is issued. (Doc. #68, Brown Dep. 64:2-6; 91:25-92:5; 115:11-16.)[3]  Provost Toll stated that his letter was an "indication that the original final decision was the final final decision."  (Doc. #75, Toll Dep. 21:14-15.)

The Court deals with substance, not the labels utilized by the documents or FGCU officials and employees.  The evidence convinces the Court that in the circumstances of this case and under the process utilized by FGCU, the decision of the Dean was at best a tentative final decision, and not the established official position of FGCU as to the renewal or nonrenewal of plaintiff's employment.  "The existence of careful procedures to assure fairness in the tenure decision should not obscure the principle that limitations periods normally commence when the employer's decision is made."  <u>Delaware State College v. Ricks</u>, 449 U.S. 259, 261 (1980).  The process employed by FGCU after the Dean's decision was not simply a remedy for the Dean's decision, but an opportunity for the employee to influence the ultimate

---

[3] Mr. Brown also stated, on cross-examination, that the Dean "communicates the final decision regarding extension", and then it goes on appeal.  When presented with a hypothetical, if plaintiff had done nothing in response to Dean Henry's letter and just left her position at the end of the year, Mr. Brown said "I would think so" when asked: is it done?  (Doc. #68, Brown Dep. 92:6-9; 116:14-23.)

decision before it was made.  The actual final decision is made when the University has "established its official position – and made that position apparent to [the employee]. . . ."  Id. at 262. It was Provost Toll's letter "[i]n response to the dissenting report" which, "[c]onsistent with Article 12.2" of the CBA, stated that plaintiff would not be offered further appointment beyond September 8, 2010.  (Id., p. 14.)  This decision agreed with the nonrenewal of plaintiff's contract, but extended Dean Henry's May 6, 2010 termination date by about five months.  This was the decision which stated the official position of FGCU, and which triggered the time for filing an EEOC charge.

The Court finds that the alleged discrimination in this case – the nonrenewal and termination – occurred on September 4, 2009. The EEOC Charge was timely filed, and plaintiff properly exhausted her administrative remedies except as discussed below.

**IV.**

Count II of the Amended Complaint alleges a claim of national origin discrimination under Title VII.  Plaintiff claims she is a member of a protected class because she was born in the United States, and that the "real reason" FGCU did not renew her contract was because of her national origin as a U.S. born person.  (Doc. #8, ¶¶69-76.)  This claim is both untimely, and alternatively, without any factual support.

26

It is undisputed that the national origin claim was not specifically identified in either the original Charge of Discrimination or the amended Charge of Discrimination. (Doc. #64-3, pp. 5-6.) It is also undisputed that the National Origin box was not checked on the EEOC Intake Questionnaire. (Doc. #17-3, Composite Exh. C, p. 3.) Plaintiff argues, however, that the claim is "like, or related to" the claims of discrimination which were actually made in the Charges, and was therefore properly exhausted.

Because a Title VII plaintiff must first exhaust administrative remedies by filing a timely discrimination charge with the EEOC, a "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Gregory v. Ga. Dep't of Human Res., 355 F.3d 1277, 1280 (11th Cir. 2004). To determine whether a complaint falls within this scope, the Court asks whether the judicial complaint is "like or related to, or grew out of, the allegations contained in her EEOC charge." Id. at 1280. Plaintiffs may not raise "[a]llegations of new acts of discrimination" in the judicial proceedings, Wu v. Thomas, 863 F.2d 1543, 1547 (11th Cir. 1989), but the scope of an EEOC charge is not strictly interpreted, Gregory, 355 F.3d at 1280.

"The [EEOC] defines national origin discrimination broadly as including, but not limited to, the denial of equal employment

opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group." 29 C.F.R. § 1606.1. <u>See also</u> <u>Saint Francis Coll. v. Al-Khazraji</u>, 481 U.S. 604, 614 (1987) (Brennan, J., concurring) (noting that national origin claims are often treated as ancestry or ethnicity claims, and birthplace alone is insufficient).

Nothing in plaintiff's EEOC filings would have placed the EEOC on notice that she was claiming FGCU engaged in discrimination against her because she was born in the United States. Both Charges state that plaintiff sent an email to the EEO Officer on May 30, 2009, regarding discrimination against her "due to my race and age;" plaintiff did not refer to her birth in the United States as a basis of the discrimination. Nothing plaintiff told EEOC provided notice of this "U.S. born" claim, which was not sufficiently related to either race, age, or gender to allow EEOC to guide their investigation. Plaintiff's national origin claim was not like or related to any of her actual claims of discrimination, and therefore was not properly exhausted with the EEOC. Count II is therefore dismissed.

Alternatively, plaintiff's national origin claim lacks any factual support and therefore summary judgment is entered in favor of FGCU. Plaintiff's claim is that she was discriminated against based on national origin (i.e., being born in the United States)

because she was replaced by a Caucasian foreign born male. Even if it could be said that being born in the United States is like or related to any of the actual allegations made by plaintiff, summary judgment would still be granted because there is absolutely no evidence supporting such a claim. Literally nothing in the record suggests the FGCU did not renew plaintiff's contract because they wanted to hire someone who was not born in the United States. Indeed, the record establishes that FGCU first offered the position to Krista Bywater, but she declined the job offer. It was only afterwards that the position was offered to Jan-Martijn Meij, a white male who, because he had an H1 visa, was presumably born outside the United States. (Doc. #74-3, Strahorn Exh. 22, p. 82; id., Strahorn Exh. 23, p. 83; Doc. #74, Strahorn Dep. 20:5-6.) Nothing suggests that plaintiff's nonrenewal and termination was because she was born in the United States and FGCU wanted to hire a foreign born person.

The Court finds that that national origin claim in Count II is not like, or even related to the initial charge's allegations of race discrimination. Count II is dismissed with prejudice as time-barred. Alternatively, if it is like or related, summary judgment is granted in favor of defendant as to Count II.

**V.**

Counts I and III assert claims or discrimination based on race and gender under Title VII, 42 U.S.C. § 2000e-2(a)(1).[4]  The framework for plaintiff to establish her prima facie case of discrimination is well established under the burden-shifting analysis of McDonnell Doulgas Corp. v. Green, 411 U.S. 792 (1973): Plaintiff must show that she was a qualified member of a protected class, that she was subjected to an adverse employment action, and that this was different than similarly situated employees outside the protected class.  Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010).  "When the plaintiff establishes a prima facie case, which creates the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions."  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004).  "If the employer satisfies its burden by articulating one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to

---

[4] Although raised in the Charge of Discrimination, plaintiff does not allege age discrimination in the Amended Complaint.

offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." Id.

For purposes of summary judgment, defendant does not contest that plaintiff was qualified for the position, that she is a member of a protected class, and that she was subjected to an adverse employment action. Defendant argues that plaintiff has not shown discrimination because she has not shown comparators. Plaintiff does not contest the absence of comparators, but argues that a comparator is not required if discrimination may be inferred from the circumstantial evidence, and there is sufficient circumstantial evidence present in this case.

A plaintiff usually sets forth her prima facie case through indirect, circumstantial evidence[5], and by use of comparators, Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1255 (11th Cir. 2012), but the "methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation", Wilson, 376 F.3d at 1087. The failure to produce a comparator will not "necessarily doom the plaintiff's case." Gate Gourmet, Inc., 683 F.3d at 1255. For example, in

---

[5]If the evidence only suggests, but does not prove discriminatory intent, it is circumstantial evidence. Burrell v. Bd. of Trustees of Georgia Military Coll., 125 F.3d 1390, 1393 (11th Cir. 1997).

Gate Gourmet,[6] the record contained enough non-comparator evidence

to support the claim of pregnancy discrimination.  A plaintiff

> will always survive summary judgment if [s]he
> presents circumstantial evidence that creates
> a triable issue concerning the employer's
> discriminatory intent.  [ ]  A triable issue
> of fact exists if the record, viewed in a light
> most favorable to the plaintiff, presents "a
> convincing mosaic of circumstantial evidence
> that would allow a jury to infer intentional
> discrimination by the decisionmaker.

Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir.

2011) (citations omitted).  The record, viewed in a light most

favorable to the plaintiff, presents a convincing mosaic of

circumstantial evidence that would allow a jury to infer

intentional discrimination by the decisionmaker.

"The employer may fire an employee for a good reason, a bad

reason, a reason based on erroneous facts, or for no reason at

all, as long as its action is not for a discriminatory reason."

Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir.

1984).  The Court is "not in the business of adjudging whether

employment decisions are prudent or fair.  Instead, [the] sole

concern is whether unlawful discriminatory animus motivates a

challenged employment decision."  Damon v. Fleming Supermarkets of

Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999) (citing Nix, 738

---

[6] Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1256
(11th Cir. 2012).

F.2d at 1187).   Ultimately, the burden remains with plaintiff who must show that reasons proffered were pretextual.   Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981).

Defendant has identified legitimate, nondiscriminatory reasons for nonrenewal of plaintiff's contract.   Dean Henry identified the non-completion of PIP requirements as the basis for the nonrenewal decision, including:   (1) failing to follow the correct procedure when administering the Student Assessment of Instruction in each course, i.e., by administering the assessment during a class examination; (2) failing to submit all paperwork on time, including a Sabbatical Report, and refusing to provide a copy when requested; and (3) failing to provide a complete course syllabus on the first day of class, i.e., that requires the requisite inclusion of certain policies.   (Doc. #65-9, pp. 179-180.)   While these reasons appear relatively trivial, they came on the heels of numerous complaints by students and by Chair Strahorn leading to plaintiff's probationary status before the decision not to renew.

Plaintiff responds to each of the three reasons for nonrenewal articulated by Dean Henry as follows:   Plaintiff first argues that the Sabbatical Report was indeed submitted, but to President Bradshaw.   Plaintiff states that no one provided any notice that it was not available or required, or an issue prior to Dean Henry's email request for a copy (which she refused).   Prior to Dean

33

Henry's request for a copy, the Sabbatical Report was not even considered by Chair Cudjoe or the PRC in their evaluations. (Doc. #79, pp. 20-22.) Chair Cudjoe testified that the PIC did not reference the sabbatical because it was taken in the previous academic year and so didn't fall under Chair Cudjoe's time as chair. (Doc. #70, Cudjoe Dep. 84:15-19.) Chair Cudjoe could not confirm if the sabbatical report was ever submitted, and it was never discussed or asked about by the dean or provost. (Id., 85:23-86:2; 86:8-13.)

Plaintiff notes that she notified Chair Cudjoe that she was administering the Student Assessment of Instruction on an exam day, but that neither Chair Cudjoe nor the PRC felt that it warranted nonrenewal. Plaintiff points out that a Caucasian professor who did not report her mistake of failing altogether to distribute the Student Assessment of Instruction was found to be overall satisfactory, and had her contract renewed. Chair Cudjoe testified that he would have elected to not administer the evaluation rather than doing it on an examination day "because it's spelled out that [you] don't administer it on the date you're giving an exam, and there's a reason for that. To make sure that students are not pressured to answer questions at the evaluation one way or the other due to the exam." (Doc. #70, Cudjoe Dep. 81:4-8.) Chair Cudjoe would not have denied reinstatement on this issue alone. (Id., 82:11-13.)

Plaintiff alleges that the Syllabi were reviewed by both Chair Cudjoe, and the PRC, and found to be sufficient, but Dean Henry concluded otherwise by pointing out deficiencies.   Plaintiff argues that there was no guideline or policy requiring the inclusion of certain language at the time, and therefore Dean Henry imposed additional requirements on plaintiff to legitimize her decision to not renew plaintiff's contract.   On March 27, 2009, after the semester had started and syllabi were all done, defendant approved Guidelines for Course Syllabus.   (Doc. #70, Cudjoe Dep. 90:10-24.)   Chair Cudjoe did not think the syllabi were deficient. (Id., 92:8-11.)   Plaintiff provided an Affidavit (Doc. #79-1, Exh. 1) and attached a composite of other faculty members' syllabi that also lacked the requisite language, but none of them were denied renewal or disciplined.

"[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.   In this case, the Court is not satisfied that the undisputed material facts establish that a reasonable jury could not find that the nonrenewal decision was the product of racial and/or gender discrimination.   While the evidence is far from overwhelming, summary judgment is "improper" if the fact-finder must weigh the credibility of the deponents.   Strickland v.

Norfolk S. Ry. Co., 692 F.3d 1151, 1162 (11th Cir. 2012).  The motion will be denied as to Counts I and III.

## VI.

Count IV alleges a claim of retaliation.  Title VII also prohibits retaliation against an employee who opposes unlawful employment discrimination, or otherwise charges or participates in an investigation or hearing into unlawful employment discrimination.  Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008).  "To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) [s]he engaged in statutorily protected expression; (2) [s]he suffered an adverse employment action; and (3) there is some causal relation between the two events."  Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998).

"Title VII retaliation claims must be proved according to traditional principles of but-for causation. . . ."  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013).  When establishing a causal connection between the protected activity and the adverse action, generally a plaintiff must show that: (1) the decision-makers were aware of the protected conduct and (2) the protected conduct and adverse action(s) were not "wholly unrelated."  Walker v. Sec'y, U.S. Dep't of Air Force, 518 F. App'x 626, 628 (11th Cir. 2013) (citation omitted).  The decision-maker

must actually be aware of the protected activity.  Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993).

Plaintiff alleges that she complained of race discrimination and harassment to Dr. Charles McKinney[7] in Fall of 2008.  (Doc. #79-1, Exh. 1, ¶ 7.)  In an email dated May 30, 2009, to Dr. McKinney, plaintiff stated:

> As you know, I have been and continue to be very overwhelmed, depressed, and concerned about the treatment I have been receiving these last few years.  While I have no doubt, that there has been the ever present subtle racism since I came to FGCU, and I have experienced the periodic harassment, based perhaps on gender and perhaps based on race; I believe, over these past two years, the overt harassment, micromanaging and other behaviors culminating in my termination based upon invalid evaluations and other invalid "reasons" is a direct result of age discrimination.  It began when I turned 60 years old, and has not ceased since then.  I have expressed this to you and other administrators in a speculative way over the past couple of years . . . "Could this be happening because I am an older faculty member?" . . . but, as I assess the evolution of events and behaviors, now I am convinced. All of a sudden when I turned 60 years old (my birthday was May 13, 2007 and the unsatisfactory evaluation was given in June) things that had been "normal and acceptable" were all of a sudden were not acceptable.  You have to admit, it seems more than coincidental.

---

[7] Prior to his retirement, Dr. McKinney was the Ombudsman and special assistant to the President, Doc. #67, Bradshaw Dep. 28:20-22, and/or the Director of the Office Equity and Diversity, Doc. #75, Toll Dep. 123:9-10.

(Doc. #65-9, Exh. 114, p. 296; Doc. #75-5, Toll Exh. 31, p. 17.) Plaintiff also stated that she spoke to Dr. McKinney a number of times in the past about race discrimination, and with Dr. Bradshaw. (Doc. #65-1, Plaintiff Dep. 12:11-13:2.) Plaintiff did not recall having a conversation regarding race discrimination with anyone else except members of the union. Plaintiff stated that Dr. McKinney spoke to Provost Toll, albeit informally. (Id. 15:24-16:6.) Plaintiff also emailed the EEO Officer on May 30, 2009, and May 30, 2009, fell between informal resolution meetings, and before the Provost's final decision. See supra pp. 15, 17, 28.

Dr. Bradshaw only recalled plaintiff stating that she was being treated unfairly, but he did not recall plaintiff using the term discrimination or harassment. (Doc. #67, Bradshaw Dep. 9:21-23, 10:3-4.) Provost Toll recalled having conversations regarding plaintiff with Dr. McKinney, about how she sought him out to talk, but Provost Toll did not specifically recall that he was told that plaintiff complained of discrimination. (Doc. #75, Toll Dep. 123:23-124:16.) Dean Henry stated that Dr. McKinney did not mention discrimination, in any form, and did not tell her that plaintiff believed she was being discriminated against on the basis of race. (Doc. #72, Henry Dep. 229:12-18.)

If plaintiff reasonably believed, subjectively and objectively and in good faith, that her employer engaged in an unlawful employment practice in violation of Title VII, she can

make a prima facie case of retaliation.  Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997).  The Court finds that the undisputed material facts do not entitle defendant to summary judgment on the retaliation claim, and that a jury may indeed find that her termination was caused by one or more protected activities.

Accordingly, it is now

**ORDERED:**

Defendant's Motion for Summary Judgment (Doc. #64) is **GRANTED IN PART AND DENIED IN PART**.  The motion is denied as to the timeliness of the EEOC Charge of Discrimination; and granted as to Count II (national origin) as time-barred or, alternatively, for lack of any supporting evidence, and denied as to Count I (race) and Count III (gender) and Count IV (retaliation) on the merits.

**DONE AND ORDERED** at Fort Myers, Florida, this  __23rd__  day of January, 2017.


_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE


Copies:
Counsel of record